SOFTMAN PRODUCTS COMPANY, LLC, Plaintiff,

v.

ADOBE SYSTEMS INC.; et al., Defendants,

And Related Counterclaims.

No. CV 00–04161DDP(AJWX).

United States District Court,· C.D. California.

Oct. 19, 2001.

---

Martin L. Stanley, Martin L. Stanley Law Offices, Santa Monica, CA, John D. McCurdy, Michael Miretsky, McCurdy & Leibl, Sherman Oaks, CA, for Plaintiff.

Ian N. Feinberg, L. Scott Oliver, Kimberly N. Van Voorhis, Gray Cary Ware & Freidenrich, Palo Alto, CA, for Defendants.

## ORDER RE APPLICATION FOR PRELIMINARY INJUNCTION

PREGERSON, District Judge.

This matter comes before the Court on the counter-claimant Adobe's application for a preliminary injunction. After reviewing and considering the materials submitted by the parties, and hearing oral argument, the Court adopts the following order.

### I. Background

The counter-claimant Adobe Systems Inc. ("Adobe") is a leading software development and publishing company. The counter-defendant SoftMan Products Company ("SoftMan") is a Los Angeles-based company that distributes computer software products primarily through its web-

site, www.buycheapsoftware.com. Adobe alleges that since at least November 1997, SoftMan has distributed unauthorized Adobe software, including Adobe Educational software[1] and unbundled Adobe "Collections."[2] By distributing the individual pieces of Adobe Collections, Adobe contends that SoftMan is infringing Adobe's copyright in these products and violating the terms of Adobe's licenses. While SoftMan agrees that it is breaking apart various Adobe Collections and distributing the individual pieces of them as single products, SoftMan claims that it is entitled to distribute Adobe software in this manner. There is no direct contractual relationship between Adobe and SoftMan.

Adobe distributes its products through "licensing" agreements with distributors.[3] Each piece of Adobe software is also accompanied by an End User License Agreement ("EULA"), which sets forth the terms of the license between Adobe and the end user for that specific Adobe product. The EULA is electronically recorded on the computer disk and customers are asked to agree to its terms when they attempt to install the software. (SoftMan Opp. at 4.)

Adobe alleges, among other things, that SoftMan has infringed on Adobe's trademark by distributing incomplete versions of Adobe software. The central difference between these allegedly incomplete products and the genuine Adobe software is that when SoftMan unbundles a Collection and resells its component parts, such individual pieces of software may not be accompanied by the registration information which would entitle the bearer access to Adobe's customer support and technical services. Adobe alleges that customers may be confused about the connection between authentic Adobe software and the unauthorized versions distributed by SoftMan because a consumer may acquire a product from SoftMan as a "Retail" version when, in fact, it is a piece of an unbundled Adobe Collection.

On August 27, 2001, this Court granted a temporary restraining order and seizure order against SoftMan. On September 10, 2001, the Court entered a preliminary injunction, to be in effect for the duration of the Court's review of the supplemental briefing submitted by the parties following oral argument.

## II. Legal Standard

■■■■ "A party seeking a preliminary injunction must show 'either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.'" *Micro Star v. Formgen Inc.*, 154

---

1. SoftMan agrees that, at one point, it sold Adobe Educational software, but disputes that it has done so within the past year. (SoftMan Opp. at 6.)

2. "Collections" are sets of individual Adobe products, such as Adobe Photoshop or Illustrator on separate CD's, that are sold together in a larger Adobe Retail Box. These Collections are offered by Adobe at a discount from the individual retail products comprising the Collection. (Adobe Mot. at 3.) "An example of an Adobe Collection is the Adobe Publishing Collection, comprised of Adobe PageMaker, Acrobat, Photoshop and Illustrator, for $999. Separately, these products retails as follows: Pagemaker—$499, Acrobat—$249, Photoshop—$609 and Illustrator—$399." (*Id.*)

3. Specific agreements include the Adobe Authorized Reseller Agreement (for distribution of full Retail versions of Adobe software), the Adobe Off–Campus Educational Reseller Agreement ("OCRA") for distribution of Educational software, and the Original Equipment Manufacturer Agreements ("OEM") (for distribution of Adobe software coupled to hardware such as a scanner). (Snyder Decl. ¶ 7, Ex. 2; Williams Decl. ¶ 3, Ex. 1.)

F.3d 1107, 1109 (9th Cir.1998) (quoting *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1174 (9th Cir. 1989)). In granting a preliminary injunction, a district court must find that the movant demonstrated either: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir.1999). Irreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim. *Id.* at 1066 (citing *Metro Publ'g v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993)). The traditional test for granting preliminary injunctive relief also applies in the context of a trademark action. This test requires the plaintiff to demonstrate: (1) a likelihood of success on the merits; (2) a significant threat of irreparable injury; (3) that the balance of hardships favors the plaintiff; and (4) whether any public interest favors granting an injunction. *Dollar Rent A Car v. Travelers Indem. Co.*, 774 F.2d 1371, 1374 (9th Cir.1985); *see also* Schwarzer, et al., *Federal Civil Procedure Before Trial*, § 13:44 (1999). The Ninth Circuit also uses an alternative test which requires the plaintiff to demonstrate "serious questions going to the merits and that the balance of hardships tips sharply in its favor." *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987).

## III. Discussion

### A. Copyright Infringement Claim

#### 1. Likelihood of Success on the Merits

■ To prevail on its copyright infringement claim, Adobe must show (1) that it owns the copyright to the product at issue, and (2) that SoftMan infringed Adobe's copyrights in these products. *Johnson Controls*, 886 F.2d at 1175. With respect to the second element, Adobe may prove infringement by showing that SoftMan has violated one of Adobe's exclusive rights guaranteed to copyright holders under 17 U.S.C. § 106(3).[4] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).

#### a. Copyright Ownership

Adobe's products consist of original material which is copyrightable subject matter under 17 U.S.C. § 102. There is no dispute that Adobe is the registered owner of the copyrights for all the products in question in this action.

#### b. Unauthorized Copying of a Protected Work

■ Copyright infringement exists when any of the rights granted under 17 U.S.C. § 106 are violated. *Buck v. Jewell–La Salle Realty*, 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931). Title 17 U.S.C. § 106(3) grants a copyright holder the exclusive right to distribute, and to authorize distribution of, its copyrighted work. Adobe chooses to distribute copies of its products through licensing agreements with various distributors and dealers.[5] It

---

4. Title 17 U.S.C. § 106(3) provides that the owner of a copyright has "the exclusive rights ... to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3).

5. These agreements are signed licenses between Adobe and the named distributor. Adobe's general distribution agreement pro-

vides in part: "Distributor acknowledges that the Software Products are to be licensed to End Users in accordance with the terms and conditions of the current End User License Agreement.... Distributor shall distribute the Software Products solely in the form and packaging in which they were obtained from Adobe." (Soriano Decl., Ex. 1 at p. 7.) Adobe's Reseller Agreement states that: "Reseller acknowledges that the structure and

is not disputed that SoftMan has no licensing agreement with Adobe.

In addition, each piece of Adobe software is accompanied by the EULA.[6] Once the products are distributed to the end-user, the EULA prohibits the individual distribution of software that was originally distributed as part of a Collection. Specifically, the Adobe EULA provides that the end user may "transfer all [his] rights to the Use of the Software to another person or legal entity provided that (a) [he] also transfer this Agreement, the Software and all other software or hardware bundled or pre-installed with the Software." [7] (Palma Decl., Ex. 1.)

In this case, Adobe alleges that by distributing unbundled Collections, SoftMan has exceeded the scope of the EULA and has infringed Adobe's copyrights, specifically Adobe's § 106 right to distribute and control distribution. SoftMan contends that the first sale doctrine allows for the resale of Adobe's Collection software.

### (1) *First Sale Doctrine*

The "first sale" doctrine was first analyzed by the United States Supreme Court in *Bobbs–Merrill Co. v. Straus*, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908). The Court held that the exclusive right to "vend" under the copyright statute applied only to the first sale of the copyrighted work. The doctrine has been codified at 17 U.S.C. § 109(a). It states in relevant part: "the owner of a particular copy . . . lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy." 17 U.S.C. § 109(a). One significant effect of § 109(a) is to limit the exclusive right to distribute copies to their first voluntary disposition, and thus negate copyright owner control over further or "downstream" transfer to a third party. *Quality King Distrib. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 142–44, 118 S.Ct. 1125, 140 L.Ed.2d 254 (1998). (*See* Rice Decl. ¶ 11.) The first sale doctrine vests the copy owner with statutory privileges under the Act which operate as

---

organization of the Software is proprietary to Adobe and that Adobe retains exclusive ownership of the Software and the Trademarks." (Navarro Suppl. Decl., at p. 3, ¶ 9.)

Most computer program and database product copies are distributed with standard form terms in a document characterized as a "license". The standard terms purport, among other things: to specify permitted uses of a copy, e.g., consumer or personal versus commercial; to prohibit certain uses of a computer program copy, e.g., reverse engineering of the computer program code; to forbid any use that is not expressly authorized, e.g., commercial processing of third party data or business records; and to bar transfer of a copy and the "license" to another person. (Rice Decl. ¶ 5.)

**6.** The EULA states in part: "The receiving party accepts the terms and conditions of this Agreement (EULA) and any other terms and conditions upon which [the end user] legally purchased a license to the Software." (Adobe EULA ¶ 4, attached to Palma Decl., Ex. 1.)

Adobe's EULA permits an end user, subject to certain restrictions, to transfer the software, media, and documentation to another end user. The restrictions relating to an end user's ability to transfer include that the EULA must also be transferred and that "[t]he Software and all other software or hardware bundled or pre-installed with the Software, including all copies, Updates, and prior verison, and all copies of font software converted into other formats." (*Id.*)

**7.** The parties have made much of the change to Adobe's EULA that occurred in April 2000. The Court finds that, under the current language of the EULA, Adobe's clear intent is to prohibit the unbundling activity. Therefore, assuming arguendo that the prior agreement did not prohibit the conduct at issue, the current EULA does clearly state that the "unbundling activities" are barred. (*See* Maier Decl. ¶ 3.)

limits on the exclusive rights of the copyright owners.

Adobe argues that the first sale doctrine does not apply because Adobe does not sell or authorize any sale of its software. Adobe characterizes each transaction throughout the entire stream of commerce as a license.[8] Adobe asserts that its license defines the relationship between Adobe and any third-party such that a breach of the license constitutes copyright infringement. This assertion is not accurate because copyright law in fact provides certain rights to owners of a particular copy. This grant of rights is independent from any purported grant of rights from Adobe. The Adobe license compels third-parties to relinquish rights that the third-parties enjoy under copyright law.[9]

In short, the terms of the Adobe EULA at issue prohibit licensees from transferring or assigning any individual Adobe product that was originally distributed as part of a Collection unless it is transferred with all the software in the original Collection. This license provision conflicts with the first sale doctrine in copyright law, which gives the owner of a particular copy of a copyrighted work the right to dispose of that copy without the permission of the copyright owner.

### (2) Sale v. License

#### (a) Historical Background

■ Historically, the purpose of "licensing" computer program copy use was to employ contract terms to augment trade secret protection in order to protect against unauthorized copying at a time when, first, the existence of a copyright in computer programs was doubtful, and, later, when the extent to which copyright provided protection was uncertain. (See Rice Decl. ¶ 6.) Computer program copy use "licensing" continued after federal courts interpreted the Copyright Act to provide substantial protection for computer programs as literary works. (Id. at ¶ 7.) In Step–Saver Data Systems, Inc. v. Wyse Technology, the Third Circuit examined the historical development of the use of licensing in the software industry and concluded that subsequent changes to the Copyright Act had rendered the need to characterize the transaction as a license "largely anachronistic." 939 F.2d 91, 96 n. 7 (3d Cir.1991).[10]

---

8. "From Adobe's distributors through the end users, every party along the way receives only a license. Since no party can transfer more rights than it acquired, it follows that there was no "first sale" in the transfer to SoftMan, and SoftMan's unbundling of Adobe software is copyright infringement as a matter of law." (Adobe Suppl. Brief at 5.)

9. See, e.g., Mark A. Lemley, Intellectual Property and Shrinkwrap Licenses, 68 S. Cal. L.Rev. 1239 (1995) ("Software vendors are attempting en masse to 'opt out' of intellectual property law by drafting license provisions that compel their customers to adhere to more restrictive provisions than copyright law would require.").

10. The court in Step–Saver explained: "When these form licenses were first developed for software, it was, in large part, to avoid the federal copyright law first sale doctrine. . . .

Under this doctrine, one could purchase a copy of a computer program, and then lease it or lend it to another without infringing the copyright on the program. . . . Consumers, instead of purchasing their own copy of the program, would simply rent a copy of the program, and duplicate it. . . . [S]oftware producers wanted to sue the companies that were renting the copies of the program to individual consumers, rather than the individual consumers. The first sale doctrine, though, stood as a substantial barrier to successful suit against these software rental companies, even under a theory of contributory infringement. By characterizing the original transaction between the software producer and the software rental company as a license, rather than a sale, and by making the license personal and non-transferable, software producers hoped to avoid the reach of the first sale doctrine and to establish a basis in state contract law for suing the software rental companies directly. Questions remained, however, as to

**1084**

### (b) *Adobe Sells its Software*

A number of courts have held that the sale of software is the sale of a good within the meaning of Uniform Commercial Code. *Advent Sys. Ltd. v. Unisys Corp.,* 925 F.2d 670, 676 (3d Cir.1991); *Step–Saver,* 939 F.2d at 99–100; *Downriver Internists v. Harris Corp.,* 929 F.2d 1147, 1150 (6th Cir.1991). It is well-settled that in determining whether a transaction is a sale, a lease, or a license, courts look to the economic realities of the exchange. *Microsoft Corp. v. DAK Indus.,* 66 F.3d 1091 (9th Cir.1995); *United States v. Wise,* 550 F.2d 1180 (9th Cir.1977). In *DAK,* Microsoft and DAK entered into a license agreement granting DAK certain nonexclusive license rights to Microsoft's computer software. The agreement provided that DAK would pay a royalty rate per copy of computer software that it distributed. Subsequently, DAK filed a petition for bankruptcy, and failed to pay the final two out of a total of five installments. Microsoft filed a motion for the payment of an administrative expense, claiming that it should be compensated for DAK's postbankruptcy petition use of the license agreement. On appeal, the Ninth Circuit held that the economic realities of the agreement indicated that it was a sale, not a license to use. Thus, Microsoft simply held an unsecured claim and not an administrative expense. The court found that the agreement was best characterized as a lump sum sale of software units to DAK, rather than a grant of permission to use an intellectual property. The court in *DAK* noted:

whether the use of state contract law to avoid the first sale doctrine would be preempted either by the federal copyright statute (statutory preemption) or by the exclusive constitutional grant of authority over copyright issues to the federal government (constitutional preemption). [Citations.] Congress recognized the problem, and, in 1990, amended the first sale doctrine as it applies to computer pro-

Because we look to the economic realities of the agreement, the fact that the agreement labels itself a "license" and calls the payments "royalties," both terms that arguably imply periodic payment for the use rather than sale of technology, does not control our analysis.

*DAK,* 66 F.3d at 1095, n. 2. Other courts have reached the same conclusion: software is sold and not licensed. *See, e.g., RRX Indus., Inc. v. Lab–Con, Inc.,* 772 F.2d 543, 546 (9th Cir.1985); *Applied Info. Mgmt., Inc. v. Icart,* 976 F.Supp. 149, 155 (E.D.N.Y.1997) (finding that whether a transaction denominated a "license" was in fact a sale conveying ownership was a disputed question of fact); *Novell, Inc. v. CPU Distrib., Inc.,* 2000 U.S. Dist. Lexis 9975 (S.D.Tex.2000). In *Novell,* a software manufacturer was pursuing a discount retailer for copyright infringement. Like Adobe, CPU argued that it purchased the software from an authorized source and was entitled to resell it under the first sale doctrine. Novell claimed that it did not sell software but merely licensed it to distribution partners. The court held that these transactions constituted sales and not a license, and therefore that the first sale doctrine applied. 2000 U.S. Dist. Lexis 9975 at *18.

Adobe frames the issue as a dispute about the ownership of intellectual property. In fact, it is a dispute about the ownership of individual pieces of Adobe software. Section 202 of the Copyright Act recognizes a distinction between tangible

grams and phonorecords. [Citations.] As amended, the first sale doctrine permits only non-profit libraries and educational institutions to lend or lease copies of software and phonorecords. [citations.] (Under the amended statute, a purchaser of a copy of a copyrighted computer program may still sell his copy to another without the consent of the copyright holder.)." 939 F.2d at 96, n. 7.

property rights in copies of the work and intangible property rights in the creation itself.[11] In this case, no claim is made that transfer of the copy involves transfer of the ownership of the intellectual property within. (*See* SoftMan's Suppl. Brief at 9–10) ("Adobe has ownership rights in the copyright of [its] software."). What is at stake here is the right of the purchaser to dispose of that purchaser's particular copy of the software.

The Court finds that the circumstances surrounding the transaction strongly suggests that the transaction is in fact a sale rather than a license. For example, the purchaser commonly obtains a single copy of the software, with documentation, for a single price, which the purchaser pays at the time of the transaction, and which constitutes the entire payment for the "license." The license runs for an indefinite term without provisions for renewal. In light of these indicia, many courts and commentators conclude that a "shrinkwrap license" transaction is a sale of goods rather than a license.[12]

■ The reality of the business environment also suggests that Adobe sells its software to distributors. Adobe transfers large amounts of merchandise to distributors. The distributors pay full value for the merchandise and accept the risk that the software may be damaged or lost.[13] The distributors also accept the risk that they will be unable to resell the product.[14] The distributors then resell the product to other distributors in the secondary market. The secondary market and the ultimate consumer also pay full value for the product, and accept the risk that the product may be lost or damaged. This evidence suggests a transfer of title in the good. The transfer of a product for consideration with a transfer of title and risk of loss generally constitutes a sale. *VWP of Am., Inc. v. United States*, 175 F.3d 1327, 1338–

11. "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202.

12. The term "shrinkwrap license" refers to the fact that the license begins when the purchaser reads its terms and tears open the transparent plastic wrapping, or "shrinkwrap," that encloses the software product. "Although early shrinkwrap licenses often were visible prior to purchase, and could be read before the purchaser tore open the software's wrapping, more recent variants place the license within the software's packaging or on the disk itself." Stephen P. Tarolli, *The Future of Information Commerce under Contemporary Contract and Copyright Principles*, 46 Am. U.L.Rev. 1639, 1647–48 (1997) (footnote omitted); *see also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1450 (7th Cir.1996) ("The 'shrinkwrap license' gets its name from the fact that retail software packages are covered in plastic or cellophane 'shrinkwrap' ... vendors ... have written licenses that become effective as soon as the customer tears the wrapping from the package. Vendors prefer 'end user license' ...").

13. "In purchasing Adobe software from authorized distributors, I always understood that SoftMan was obtaining title to the particular copies it purchased.... SoftMan paid fair value for the product and assumes the risk of loss or damage upon receipt. SoftMan also assumed the risk of loss if it was unable to resell the software." (Dracup Decl. ¶ 8.)

14. SoftMan points to the language of Adobe's distribution agreements, which includes sale terms and states that the distributor assumes the risk of loss or damage of the product. (Soriano Decl., Ex. 1 at 5.7–5.14.) Therefore, SoftMan argues, Adobe transfers title in the software to its distributors subject to a license restricting the distributor's rights and the manner in which the distributor may sell the software. In addition, SoftMan argues that even if title does not pass to the distributors, the distributors may still transfer title in individual copies subject to the terms of the EULA. A consumer may obtain good title from a distributor who has not perfected title. Unif. Comm.Code § 2–403(2).

39 (Fed.Cir.1999). Professor Raymond Nimmer writes:

> Ownership of a copy should be determined based on the actual character, rather than the label, of the transaction by which the user obtained possession. Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has a right to possession, the transaction is a sale. In this situation, the buyer owns the copy regardless of the label the parties use for the contract. Course of dealing and trade usage may be relevant, since they establish the expectations and intent of the parties. The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy.

Raymond Nimmer, *The Law of Computer Technology* § 1.18[1] p. 1–103 (1992). The Court agrees that a single payment for a perpetual transfer of possession is, in reality, a sale of personal property and therefore transfers ownership of that property, the copy of the software.

Other commentators have urged courts to look at the substance rather than the form of licensing agreements. *See, e.g.,* David A. Rice, *Licensing the Use of Computer Program Copies and the Copyright Act First Sale Doctrine,* 30 Jurimetrics J. 157 (1990). In particular, the following factors require a finding that distributing software under licenses transfers individual copy ownership: temporally unlimited possession, absence of time limits on copy possession, pricing and payment schemes that are unitary not serial, licenses under which subsequent transfer is neither prohibited nor conditioned on obtaining the licensor's prior approval (only subject to a prohibition against rental and a requirement that any transfer be of the entity),

and licenses under which the use restrictions principal purpose is to protect intangible copyrightable subject matter, and not to preserve property interests in individual program copies. *Id.* at 172.

Adobe relies primarily on two cases to support its proposition that software is licensed and not sold. In *Microsoft Corp. v. Harmony Computers & Elecs., Inc.,* 846 F.Supp. 208, 212 (E.D.N.Y.1994), the court assumed without analysis that the transaction was a license rather than a sale and held that distribution outside the scope of a license agreement constituted copyright infringement. The Court finds *Harmony*'s facts to be distinguishable. In that case, the defendants were selling *counterfeit* Microsoft products. Here, Adobe does not allege that SoftMan sells counterfeit Adobe software.

Adobe also relies on *Adobe Sys. Inc. v. One Stop Micro, Inc.,* 84 F.Supp.2d 1086, 1093 (N.D.Cal.2000). The court held that One Stop's distribution of Educational versions of Adobe software to non-educational end users was outside the scope of Adobe's license and in violation of Adobe's exclusive right to distribute under § 106(3). In *One Stop,* an unlicensed reseller admitted to adulterating the packaging for Adobe Educational software and transferring it as retail Adobe products for prices below the street price of the retail product. *Id.* The court further held that One Stop could not claim to have title for first sale purposes while the end user only obtained a license. The Court finds the facts of *One Stop* to be distinguishable from the instant case. In *One Stop,* the issue was peeling off and destroying the "Education version" stickers on software, as well as destroying bar code and serial numbers on the software, and then reselling it as commercial software. *Id.* at 1088. To the extent that the court in *One Stop* found that the transaction at issue was in fact a license, and not a

sale, this Court simply declines to adopt that analysis. In *One Stop*, the court placed great weight on the declarations of Adobe's experts that licensing is the preferred method of distributing software. The Court understands fully why licensing has many advantages for software publishers. However, this preference does not alter the Court's analysis that the substance of the transaction at issue here is a sale and not a license.

### (c) *EULA Terms*

Adobe argues that the EULA requires construction of the transaction as a license rather than a sale. The Court finds that SoftMan is not bound by the EULA because there was no assent to its terms.

#### i) *Assent*

Adobe contends that the EULA limits the consumer's ability to transfer the software after buying it. According to SoftMan, a hard copy of the EULA agreement is not enclosed with the individual Adobe software disk. Instead, consumers are asked to agree to its terms as part of the installation process. (Dracup Decl. ¶ 7.)

Courts have required that assent to the formation of a contract be manifested in some way, by words or other conduct, if the contract is to be effective. E. Allan Farnsworth, *Farnsworth on Contracts* § 3.1 (2d ed.2000). As the court noted in *Specht v. Netscape Communications Corp.*, 150 F.Supp.2d 585 (S.D.N.Y.2001): "The case law on software licensing has not eroded the importance of assent in contract formation. Mutual assent is the bedrock of any agreement to which the law will give force. Defendants' position, if accepted, would so expand the definition of assent as to render it meaningless." *Id.* at 596.

In the instant case, the Court finds that there is only assent on the part of the consumer, if at all, when the consumer loads the Adobe program and begins the installation process. It is undisputed that SoftMan has never attempted to load the software that it sells. Consequently, the Court finds that SoftMan is not subject to the Adobe EULA.

Adobe fails to offer a compelling rationale for how SoftMan becomes subject to Adobe's licenses if SoftMan never loads the software onto computers. Adobe claims that the EULA is enforceable against SoftMan because the boxes containing Adobe software (including Collections) clearly indicate that use is subject to the consumer's agreement to the terms contained in EULA inside. *See, e.g., ProCD*, 86 F.3d at 1451. Like the CD boxes in *ProCD*, Adobe's EULAs state that the product can be returned if the terms are not agreed to by the end user. The Adobe Collections boxes state: "NOTICE TO USERS: This product is offered subject to the license agreement included with the media." (Navarro Decl. at p. 2.) However, the existence of this notice on the box cannot bind SoftMan. Reading a notice on a box is not equivalent to the degree of assent that occurs when the software is loaded onto the computer and the consumer is asked to agree to the terms of the license.

Adobe further asserts that whether SoftMan is characterized as a distributor or reseller, SoftMan would be bound by the terms of these license agreements, which state that Adobe retains ownership of its software products, as well as the media upon which these software products are distributed. It is undisputed that SoftMan is not a signatory to any licensing agreements. Yet Adobe claims that although SoftMan has never signed an agreement with Adobe, the terms of Adobe's distribution agreements all apply to SoftMan.

In *One Stop*, the court stated that although One Stop was not a signatory to an

Adobe licensing agreement, it was nevertheless subject to the restrictions of those agreements. 84 F.Supp.2d at 1092. The court found that by obtaining Adobe software from a party to an Adobe licensing agreement, One Stop was bound by any restrictions imposed by that agreement. *Id.* at 1093. In *Harmony*, the court found that "to the extent that defendants bought their Microsoft Products from authorized Microsoft licensees, they were subject to the same licensing restrictions under which those licensees operated." *Harmony*, 846 F.Supp. at 213. The Court declines to adopt the analysis of these cases.

The Court finds that Adobe's EULA cannot be valid without assent. Therefore, SoftMan is not bound by the EULA because it has never loaded the software, and therefore never assented to its terms of use.

### ii) *Shrinkwrap Licenses In General*

Whether contracts such as Adobe's EULA, often referred to as "shrinkwrap" licenses, are valid is a much-disputed question.[15] A number of courts that have addressed the validity of the shrinkwrap license have found them to be invalid, characterizing them as contracts of adhesion, unconscionable, and/or unacceptable pursuant to the Uniform Commercial Code. *Step–Saver*, 939 F.2d 91; *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255 (5th Cir.1988). These courts have refused to recognize a bargain in shrinkwrap license that is not signed by the party against whom it is enforced. In *Step–Saver*, the Third Circuit found that the terms of a contract were formed when the

parties shipped, received and paid for the product. Therefore, the software shrinkwrap agreement constituted additional terms to the contract, and under Uniform Commercial Code § 2–207 (governing commercial counter-offers), these terms were invalid without express assent by the purchaser. In contrast, other courts have determined that the shrinkwrap license is valid and enforceable. *ProCD*, 86 F.3d at 1453; *Harmony*, 846 F.Supp. at 212.

The Court finds it unnecessary to reach the question of the general validity of shrinkwrap licenses at this stage because the Court has determined that SoftMan is not bound by the EULA because there was no assent to its terms.

### 2. *New York Times Co., Inc. v. Tasini*

Adobe claims that even if there was a first sale of the Adobe Collections, SoftMan's unbundling of the Collections and redistribution of the individual component parts still constitutes copyright infringement. Adobe cites *New York Times Co. Inc. v. Tasini*, —— U.S. ——, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001), for the proposition that the distribution of an individual component of a collective work infringes the copyright in the underlying individual work.

In *Tasini*, the Court held that print and electronic publishers infringed on the copyrights of freelance authors when the publishers placed the authors' articles in electronic databases. The Court rejected the publishers' assertions that they were protected by the reproduction and distribution privilege accorded collective work copyright owners by 17 U.S.C. § 201(c).[16]

---

**15.** The enforceability of use restrictions and transfer prohibitions set forth in standard form, non-negotiated, computer program copy "licenses" has been the subject of substantial academic and other controversy. (Rice Decl. ¶ 28.)

**16.** "Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of repro-

Adobe's reliance on *Tasini* is misplaced. The critical distinction is that *Tasini* does not address, as does the instant case, the fate of an individual *copy* of any work under the first sale doctrine. The *Tasini* Court reaffirmed that the owner of the copyright in the collective work is presumed to have acquired only the privilege of distributing the contribution as part of that particular collective work.[17]

In contrast, what Adobe alleges here is quite different. In this case, Adobe seeks to control the resale of a lawfully acquired copy of its software. Adobe's position in this action would be more akin to a journalist who claimed that ownership of the copyright to an article allowed him or her to control the resale of a particular copy of a newspaper that contained that article. The Court finds that *Tasini* is not applicable to the facts at issue.

### 3. *Copyright Infringement Conclusion*

In short, the transfer of copies of Adobe software making up the distribution chain from Adobe to SoftMan are sales of the particular copies, but not of Adobe's intellectual rights in the computer program itself, which is protected by Adobe's copyright. SoftMan is an "owner" of the copy and is entitled to the use and enjoyment of the software, with the rights that are consistent with copyright law. The Court rejects Adobe's argument that the EULA gives to purchasers only a license to use the software. The Court finds that SoftMan has not assented to the EULA and

therefore cannot be bound by its terms. Therefore, the Court finds that Adobe has not demonstrated a likelihood of success on the merits of its copyright infringement claim.

### a. *Irreparable Injury*

Since the Court finds that Adobe has not made a showing of a likelihood of success on the merits of its copyright claim, no presumption of irreparable harm is raised. *See Micro Star*, 154 F.3d at 1109. Parties seeking pretrial injunctive relief must demonstrate they will be exposed to some "significant risk of irreparable injury" if such relief is denied. *Associated Gen. Contractors of Cal. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir.1991). Before a preliminary injunction may issue, the court must identify the harm which a preliminary injunction might cause the defendant and balance it against plaintiff's threatened injury. *Armstrong v. Mazurek*, 94 F.3d 566, 568 (9th Cir.1996).

Adobe contends it will suffer irreparable injury for the following reasons: dilution of customer goodwill, price erosion of Adobe software due to SoftMan's resale activities, the Adobe name will be tarnished and consumers may stop acquiring Adobe products, loss of annual sales,[18] and dilution of trademarks. Adobe also contends that it is faced with a "Hobson's Choice" between upholding distribution agreements and denying consumers Adobe

---

ducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series." 17 U.S.C. § 201(c).

**17.** The Court held: "The publishers are not sheltered by § 201(c) ... because the databases reproduce and distribute articles standing alone and not in context, not 'as part of that particular collective work' to which the author contributed, 'as part of ... any revi-

sion' thereof, or 'as part of ... any later collective work in the same series.' Both the print publishers and the electronic publishers, we rule, have infringed the copyrights of the freelance authors." *Tasini*, — U.S. at — – —, 121 S.Ct. at 2384–85.

**18.** Adobe alleges that SoftMan grossed $700,000 from the sale of Adobe products between October 2000 and May 2001. (Van Voorhis Decl. ¶ 7, Ex. 7.)

services (satisfying Adobe's "legitimate" distribution partners at the expense of customer goodwill), or providing services to consumers holding so-called "pirated" products.

▇▇▇▇ Irreparable injury and probability of success on the merits "are not really two entirely separate tests, but that they are merely extremes of a single continuum." *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978). In this case, the Court finds that Adobe has not demonstrated probable success on the merits of its copyright claim. Nor has Adobe made a showing of irreparable injury sufficient to obtain preliminary injunctive relief. Adobe presents no specific evidence relating to dilution of customer goodwill or the direct loss of annual sales. There must be evidence of actual injury to support claims of "irreparable injury." Speculative losses are insufficient. *Goldie's Bookstore, Inc. v. Superior Court,* 739 F.2d 466, 472 (9th Cir.1984); *Caribbean Marine Serv. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988). Significantly, Adobe also admits that it discovered SoftMan's allegedly unauthorized distribution of Adobe software in November 1997. (Adobe Mot. at 6.) This delay further supports the Court's conclusion that Adobe has failed to demonstrate immediate threatened harm. The Court finds that Adobe has failed to show that it will suffer irreparable injury in the absence of preliminary injunctive relief.

### b. *Balance of Hardships*

▇▇▇ In deciding whether to grant a preliminary injunction, the Court may also balance the potential hardships that each party may suffer if the Court grants or denies Adobe's motion. *See International Jensen, Inc. v. Metrosound U.S.A.,* 4 F.3d at 819, 827 (9th Cir.1993). Given that neither Adobe nor SoftMan has submitted any evidence of economic loss except broad, general statements, the Court considers the balance of hardships to be a neutral factor.

### c. *Public Interest*

Traditionally, courts have looked to public policy considerations in determining whether to grant preliminary injunctive relief. *Chalk v. United States Dist. Court, Cent. Dist. of Cal.,* 840 F.2d 701, 711 (9th Cir., 1988) ("We recognize that the public interest is one of the traditional equitable criteria which a court should consider in granting injunctive relief."). In this case, the Court finds that important public policy considerations weigh on each side.

The Court finds that the provisions contained in Adobe's EULA purport to diminish the rights of customers to use the software in ways ordinarily enjoyed by customers under copyright law. Therefore, these restrictions appear to be inconsistent with the balance of rights set forth in intellectual property law.[19] Commentators have noted that the arguments for enforcing this balance are particularly persuasive in the context of shrinkwrap licenses because the balance of rights in intellec-

---

19. Scholars have suggested that Congress contemplated that parties might attempt to contract out of a first sale right. "Congress was explicit in the context of section 109(a) that it intended for vendors who 'contract around' the first sale doctrine to be limited to contract remedies. The approach of shrinkwrap licenses—to attempt to extend vendor rights by contract while retaining the panoply of copyright remedies—was explicitly disavowed by the Committee Note." Mark A. Lemley, *Intellectual Property and Shrinkwrap Licenses,* 68 S. Cal. L.Rev. 1239, 1283 (1995) (citing H.R. Rep. 94-1476 (1976) (providing that the parties may contract around the first sale doctrine in 17 U.S.C. 109(a), but limiting the copyright owner to contract rather than copyright remedies if they do so)).

tual property law is already tilted heavily in favor of the intellectual property owner. "The only countervailing forces favoring users are those rights specifically granted to users by federal law. In this context more than any other, therefore, it is justifiable to fear that removing or eviscerating those user rights may bring the whole edifice crumbling down." [20]

This is an area fraught with conflicting policy considerations. Software publishers are desirous of augmenting the protections offered under copyright law. In this case, through the use of licensing, Adobe seeks a vast and seemingly unlimited power to control prices and all channels of distribution. On the other hand, in the absence of copyright law violations, the market can often best regulate prices and all subsequent transactions that occur after the first sale. Sound policy rationales support the analysis of those courts that have found shrinkwrap licenses to be unenforceable. A system of "licensing" which grants software publishers this degree of unchecked power to control the market deserves to be the object of careful scrutiny.

For the reasons stated above, the Court finds that this factor weighs in favor of the counter-defendants.

## B. *Trademark Claims*

### 1. *Likelihood of Success on the Merits*

■ To prevail on its trademark infringement claims under the Lanham Act, Adobe must prove: (1) that it is the owner of a protectible trademark, and (2) a likelihood of consumer confusion as to the source, sponsorship, or origin of the goods. *Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500, 506 (9th Cir.1991).

### a. *Validity of Adobe's Marks*

■ Under the Lanham Act, registration of a trademark "shifts the burden of proof from the plaintiff, who would have to establish his right to exclusive use," to the defendant, who must rebut the presumption of the plaintiff's right to protected use. *Vuitton et Fils S.A. v. J. Young Enters., Inc.,* 644 F.2d 769, 775 (9th Cir.1981). All of Adobe's trademarks at issue in this suit are registered with the U.S. Patent and Trademark Office. SoftMan does not dispute that the Adobe trademarks are valid, protectible marks.

### b. *Likelihood of Confusion*

■ Courts apply an eight-factor test in determining whether a likelihood of confusion exists between the plaintiff's mark and the allegedly infringing mark. The relevant factors may include:

1. strength of the mark;
2. proximity of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. type of goods and the degree of care likely to be exercised by the purchaser;
7. defendant's intent in selecting the mark; and
8. likelihood of expansion of the product lines.

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979). In applying the *Sleekcraft* factors, the Ninth Circuit has cautioned that although all of the factors are relevant, some factors may be more significant depending upon the facts of the case at bar. *See Brookfield,* 174 F.3d at 1053. Further, the *Sleekcraft* court noted that it did not provide an exhaustive list of relevant factors. "Other variables may come into play depending on

---

**20.** Lemley, *Intellectual Property,* at 1283.

the particular facts presented." *Sleekcraft*, 599 F.2d at 348 n. 11.

 Evidence of actual confusion is not necessary in order to establish a likelihood of confusion. *See id.* at 353 (stating that failure to prove actual confusion is not dispositive); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir.1986). "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. As the *Sleekcraft* court explained, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Id.* at 354. The court also noted that, "[g]ood faith is less probative of the likelihood of confusion, yet may be given considerable weight in fashioning a remedy." *Id.*

 In the instant case, the parties do not dispute that SoftMan is reselling genuine, albeit repackaged, Adobe software. The resale of genuine trademarked goods generally does not constitute infringement. *See, e.g., NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.1987). Under the first sale doctrine, resale by the first purchaser of the original article under the producer's trademark is generally neither trademark infringement nor unfair competition. *See Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir.1995). The rationale behind the rule is that "trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *NEC Elecs.*, 810 F.2d at 1509 (sale of genuine trademarked product by seller unauthorized to sell not a violation of Lanham Act). Moreover, "[t]he 'first sale' rule is not rendered inapplicable merely because consumers erroneously believe the reseller is affiliated with or authorized by the producer." *Sebastian*, 53 F.3d at 1076.

 The first sale doctrine does not apply, however, when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner. When the reseller's conduct goes beyond the mere resale of trademarked goods, such conduct may be sufficient to support a cause of action for infringement. *Id.* A materially different product is not genuine, and therefore its unauthorized sale constitutes trademark infringement. *See Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1087 (9th Cir.1998) (noting that a non-conforming product is not genuine and " '. . . its distribution constitutes trademark infringement' " (quoting *Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996))). In this case, SoftMan's conduct goes beyond the mere resale of trademarked goods.

 Clearly, not just any difference will cause consumer confusion. A material difference is one that consumers consider, on average, relevant to a decision about whether to purchase a product. *See Martin's Herend Imps., Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296 (5th Cir.1997). In this case, the sale of software without access to customer support and technical services is a difference that an average consumer would consider relevant to a decision about whether to purchase a product.

According to both parties, the copies of Adobe software that SoftMan distributes are identical to lawful copies of these products. Adobe claims that SoftMan repackages and resells the Adobe software without "crucial registration elements such as a registration card." (Adobe Mot. at 13.) Adobe further argues that the copies lack customer support and technical support

information. Even if the software does contain these documents, Adobe claims, "customer service and technical support may be denied." (*Id.* at 17.) In short, Adobe contends that the crucial difference between the Adobe-packaged software and the SoftMan-packaged Adobe software is that the SoftMan version lacks the necessary registration capabilities. Adobe has submitted evidence that its investigators purchased Adobe products from SoftMan that lacked a registration and quick reference card. (Palma Decl. ¶ 12.) Without the ability to register a product, Adobe states that customers cannot receive technical support. Therefore, Adobe argues, customers who buy unbundled Adobe software from SoftMan may be deceived or confused as to whether they are entitled to the customer support and technical services normally associated with the purchase of software.

SoftMan disputes that unbundled collections of Adobe software are ineligible for support. According to SoftMan:

> In fact, the registration process is individual to each program in the collection. Each program has an individual serial number. The number is the only thing required to register a program and become eligible for customer support. A consumer who purchases a collection can register the programs contained therein by listing each serial number on a registration card or by going on-line and entering each serial number at the designated web site. A consumer who purchases a single program from SoftMan can similarly register that program by entering the serial number contained on each disk in the designated web site.

(SoftMan Suppl. Brief at 13–14.)

■ The Court finds that customer support and technical services are intertwined functions that may be required to insure a "genuine" Adobe product. If the software sold by SoftMan lacked the capacity for registration, then the copies sold by SoftMan would not be "genuine" insofar as they failed to include access to Adobe's technical support and customer service. In such a case, when the altered products bear Adobe's name and are in fact actual Adobe-manufactured software, the Court concludes that these end-products, re-shrinkwrapped by SoftMan, could create customer confusion and could infringe Adobe's trademarks.

There are a number of factual disputes to be resolved, however, before the question of whether a material difference exists between SoftMan's repackaged Adobe software and Adobe's standard software. Whether consumers in fact can and do access Adobe customer support when they buy Adobe software from SoftMan is disputed. At oral argument, Adobe's counsel seemed to indicate that customer service and support might be unavailable to consumers who purchased Adobe software from SoftMan, but that such decisions were made on an ad hoc basis. Adobe does not demonstrate a likelihood of success on the merits of this claim because questions of fact predominate as to the central issue. In a situation where each party makes opposing representations as to a disputed fact going directly to Adobe's likelihood of success on the merits, the Court will assign no weight to this factor.

### 2. *Irreparable Injury*

■ The Court will not presume irreparable injury to Adobe in this case because Adobe fails to make a showing of likelihood of success on the merits of its trademark infringement claim. *Brookfield,* 174 at 1066. For the reasons stated above, the Court finds that preliminary injunctive relief is not necessary in this case to prevent to irreparable injury in the form of harm to Adobe's trademark.[21]

---

**21.** Adobe also brings claims for Unfair Competition under Section 43(a) of the Lanham

### 3. *Public Policy*

The Ninth Circuit has held that public policy favors granting an injunction when an infringing product is likely to cause consumer confusion. *See Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 300–02 (9th Cir.1979), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). As discussed above, the Court does not find that Adobe has demonstrated a likelihood of success on the merits of the question of consumer confusion. Therefore, public policy considerations do not weigh in favor of granting Adobe's request for a preliminary injunction.

### IV. Conclusion

As set forth above, the Court finds that Adobe has not demonstrated a likelihood of success on the merits of its trademark or copyright claims. The Court finds that Adobe has not demonstrated that it will suffer irreparable injury in the absence of preliminary injunctive relief, particularly in light of Adobe's own admissions that it has known about SoftMan's activities since 1997. The Court denies Adobe's application for a preliminary injunction. The Court hereby ORDERS that the prelimi-

Act and Unfair Competition under California Business & Professional Codes Section 17200 et seq. Section 43(a) of the Lanham Act prohibits the use of any false designation of origin which is likely to cause confusion as to the origin of the goods. 15 U.S.C. § 1125(a). Section 43(a) protects qualifying registered trademarks. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Adobe asserts that by unbundling Collections software and then re-shrinkwrapping them and distributing them as individual pieces of Retail software, SoftMan is using Adobe's trademarks in a manner calculated to mislead and to deceive consum-

nary injunction entered by this Court on September 10, 2001 be VACATED.

IT IS SO ORDERED.

ers concerning the affiliation, connection, or association of SoftMan with the true owner of the Adobe trademarks. For the reasons stated above relating to the existence of factual disputes on the question of consumer confusion (questions that preclude a finding that Adobe has demonstrated a likelihood of success on the merits of its trademark infringement claim), the Court finds that Adobe has not demonstrated a likelihood of success on the merits or irreparable injury on these additional claims. The Court denies Adobe's request for preliminary injunctive relief on these additional grounds.