**ADOBE SYSTEMS INCORPORATED, a Delaware corporation, Plaintiff,**

v.

**ONE STOP MICRO, INC. dba Signal Computing, a New Jersey corporation, et al., Defendants.**

**No. C 97–20980 JW.**

United States District Court, N.D. California.

Feb. 2, 2000.

Ian Feinberg, Gray Cary Ware & Freidenrich, Palo Alto, CA, for plaintiff.

Charles Lee Thomason, Thomason & Moser, Red Bank, NJ, for defendants.

## AMENDED ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Docket Nos. 94 and 189]

WARE, District Judge.

### I. INTRODUCTION

On February 2, 1999, Defendant One Stop Micro, Inc. ("One Stop") filed a motion for summary judgment and noticed it for hearing on March 8, 1999. On March 22, 1999, the Court conducted a hearing on the motion. The Court found it appropriate to take the matter under submission and ordered Plaintiff Adobe Systems, Inc. ("Adobe") to file a cross motion for summary judgment. Adobe filed its cross motion for partial summary judgment on April 12, 1999 and noticed it for hearing on May 17, 1999. The Court conducted a hearing on the cross motions on November 8, 1999.[1] Based upon all papers filed to date and the oral argument of the parties, the Court denies Defendant's motion for summary judgment and grants in part Plaintiff's motion for partial summary judgment.

---

1. The delay in hearing the cross motions is partly attributable to a stay of the action triggered by One Stop's filing for bankruptcy.

## II. FACTUAL BACKGROUND

Adobe is a software development and publishing company. Adobe's products include "Adobe PageMaker," "Adobe Photoshop," "Adobe Premiere," and "Adobe Illustrator." These programs are among the most successful graphics and desktop publishing software tools on the market. In addition to making full retail versions of its software packages, Adobe also makes educational versions, which are available to students and educators at a significant discount. Unlike the full retail versions of the programs, the educational versions do not include upgrades and technical support. In addition, some educational versions lack certain program features and functions.

Adobe initially distributes the educational versions to an Adobe-authorized educational distributor, who then transfers the software to an Adobe-authorized educational reseller. The educational reseller's relationship with Adobe is governed by the "Off Campus Reseller Agreement" or the "On Campus Reseller Agreement" ("OCRA"). Under the OCRA, an educational reseller is "to make the Educational Software Products available to certain of Reseller's customers who are Educational End Users."

Defendant One Stop buys and sells computer hardware and software on the open market. Adobe alleges that One Stop improperly acquired educational versions, which it then adulterated and sold as full retail versions to non-educational end users. One Stop admits that it adulterated approximately one half of the Adobe educational versions it acquired in 1996 and 1997 by doing the following: (1) cutting open and removing Adobe's shrink-wrap; (2) peeling off and destroying the "EDUCATION VERSION—Academic ID Required" stickers, as well as the UPC bar code label and the serial number label which further identify the packages as educational versions; and, (3) re-shrink-wrapping the boxes. One Stop then distributed these adulterated versions.

On October 30, 1997, Adobe filed suit against One Stop. The second amended complaint alleges the following claims: (1) copyright infringement, (2) violation of Lanham Act, (3) federal trademark infringement, (4) violation of Lanham Act for dilution of famous mark, (5) unfair competition in violation of state law, (6) trademark infringement in violation of state law, (7) trademark dilution in violation of state law, (8) unjust enrichment, and (9) interference with contractual relations.

On March 31, 1999, the Court issued an order granting Adobe summary adjudication on violations of the following statutes: (1) Lanham Act § 32(a), 15 U.S.C. § 1114(1)(a); (2) Lanham Act § 43(a), 15 U.S.C. § 1125(a); and, (3) California Business and Professions Code §§ 17200 et seq. In its present motion, One Stop moves for summary judgment of the copyright infringement claim and the remaining trademark infringement claims on the grounds that they are barred by the first sale doctrine. One Stop argues that the first sale doctrine is applicable because the OCRA constitutes a sales agreement. In its cross motion, Adobe argues that it is entitled to summary adjudication of its copyright infringement claim and the remainder of its federal trademark infringement claim because the OCRA is in fact a licensing agreement.

## III. LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and iden-

tifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which it bears the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law ... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 2434–35, 115 L.Ed.2d 447 (1991) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630 (9th Cir. 1987). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service,* 809 F.2d at 631. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## IV. DISCUSSION

### A. The OCRA—Sale or License

■ Section 106 of the Copyright Act outlines the exclusive rights enjoyed by owners of a copyright, including the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Section 109(a), which forms the basis of the first sale doctrine, provides an important exception to § 106(3):

> the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

Thus, under the first sale doctrine, "a sale of a 'lawfully made' copy terminates a copyright holder's authority to interfere with subsequent sales or distribution of that particular copy." *Parfums Givenchy, Inc. v. Drug Emporium, Inc.,* 38 F.3d 477, 480 (9th Cir.1994). The first sale doctrine is only triggered by an actual sale. Accordingly, a copyright owner does not forfeit his right of distribution by entering into a licensing agreement. *See Microsoft v. Harmony Computers & Electronics,* 846 F.Supp. 208, 213 (E.D.N.Y.1994) (citing *ISC–Bunker Ramo Corp. v. Altech, Inc.,* 765 F.Supp. 1310, 1331 (N.D.Ill.1990)).

One Stop asserts the first sale doctrine as a defense to Adobe's copyright infringement claims. One Stop obtained its educational versions of Adobe software from educational resellers, who in turn obtained the software from Adobe through the OCRA. One Stop argues that the OCRA is a sales agreement. Thus, by purchasing copies of "sold" software programs, One Stop's distribution of those programs is protected by the first sale doctrine. Adobe, on the other hand, argues that the first sale doctrine is inapplicable because the OCRA is in fact a licensing agreement.

▇▇▇ In interpreting the OCRA, the Court must give effect to the mutual intention of the parties. *See Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). The parties' intent is inferred exclusively from the language of the contract, assuming the language is "clear and explicit." *See* Cal. Civ.Code. § 1638. Under the parol evidence rule the Court is prohibited from considering any extrinsic evidence to vary or add to the terms of a contract. *See LaCount v. Hensel Phelps Constr. Co.*, 79 Cal.App.3d 754, 770, 145 Cal.Rptr. 244 (1978). "However, the exception to the parol evidence rule is broad—extrinsic evidence is admissible to demonstrate that there is an ambiguity in an instrument and for the purpose of construing this ambiguity." *Id.* Among the extrinsic evidence a court may consider are custom and usage of words in a certain trade. *See id.; see also* Cal.Civ.Proc.Code § 1856(c) (the terms of a contract "may be explained or supplemented by course of dealing or usage of trade.").

▇▇▇ One Stop vigorously argues that the language of the OCRA is clear and explicit and is properly construed without reference to extrinsic evidence. It further contends that the OCRA's unambiguous use of sales terminology such as "purchase" and "own" compels interpretation of the OCRA as a sales agreement. One Stop points to the following language in support of its argument:

- Reseller shall have the right to **purchase** Educational Software Products ... OCRA, ¶ 3(a) (emphasis added).
- Reseller shall submit to Adobe within ten (10) days after the effective date of termination a summary of the number of the respective Educational Software Products **owned** by Reseller as of the effective date of the termination. Adobe may, at its option, **repurchase** any or all of such Educational Software Products from Reseller ... OCRA, ¶ 11(c)(iv)(A) (emphasis added).

However, the OCRA contains additional language indicating that it only confers a license. For instance, paragraph three of the agreement outlines numerous restrictions imposed upon the reseller regarding distribution of the software.[2] The restriction found in ¶ 3(a)(ii) is particularly compelling: "Reseller distributes only pursu-

---

**2.** The following is language from subpart (a) of ¶ 3. While the remainder of the paragraph contains additional restrictions, the Court finds it sufficient to include the following excerpt as an example:

(a). *Reseller Rights.* Reseller shall have the right to purchase Educational Software Products from Adobe or authorized Adobe distributors who carry the Educational Software Products and to distribute the Educational Software Products so long as it remains in compliance with all of the following conditions: (i) Reseller does not distribute outside the country in which its principal place of business is located. (ii) Reseller distributes pursuant to the terms and conditions of the then current applicable Software Product End–User License Agreement ("End User Agreement"). (iii) Reseller distributes solely to Educational End Users at Reseller's Outlet or through Reseller's direct sales force. (iv) Reseller requires each Educational End User to provide identification as follows: (1) in the case of a purchase by an individual, a valid photo ID or such other identification as is used by the educational institution for faculty, staff, or student, or (2) in the case of a purchase by an entity, an official purchase order indicating the name of the entity. (v) Reseller distributes the Educational Software Products solely in the form obtained from Adobe. (vi) Reseller provides adequate service and support in connection with the distribution of the Educational Software Products.

ant to the terms and conditions of the then current applicable 'Software Product End–User License Agreement.'" The End–User License Agreement ("EULA") is a shrink-wrap license agreement which accompanies every Adobe software product. The EULA states that "Adobe grants to you a nonexclusive license to use the Software and Documentation," provided the user agrees to certain restrictions. Thus, under the EULA the end user is only granted a license to use the software. Adobe's specific incorporation of the EULA indicates that the reseller obtains a license. It would be incongruous to conclude that educational resellers are owners of the Adobe educational versions, while the end users who the resellers distribute to are granted a mere license.

These numerous restrictions imposed by Adobe indicate a license rather than a sale because they undeniably interfere with the reseller's ability to further distribute the software. Adobe's expert, Raymond T. Nimmer, a professor of law at the University of Houston, counsel to Weil, Gotshal & Manges, and author of the book, *The Law of Computer Technology*, concludes similarly: "[t]hese restrictions are not consistent with any claim that the distributor is the owner of the copies." Nimmer Decl., ¶ 14.

While the above language supports interpretation of the OCRA as a licensing agreement, the Court finds some ambiguity remains about the ultimate interpretation of the agreement due to its use of sales terminology. Based upon this ambiguity, the Court finds it appropriate to rely upon extrinsic evidence. In a declaration submitted by Judi Webster, Adobe's Vice President and General Manager of North America, and the individual responsible for the distribution of all Adobe software products, she states that it is "Adobe's intent in drafting and signing these documents to create a license, rather than a sale of our software." Webster

Decl., ¶ 7. Thus, Adobe's intent is to create a licensing agreement by entering into the OCRA.

There is also evidence from Adobe resellers indicating that they, too, intended to enter into a licensing agreement.[3] Jeffrey Gentile, Vice President of Marketing and Purchasing for Micro Warehouse, Inc., which is an educational reseller and consequently a signatory to the OCRA, states in his declaration that he understands "Adobe's software [to be] distributed under license." Gentile Decl., ¶ 6. Peter Lock, the President and Founder of Cyber3, another educational reseller of Adobe software similarly understands the OCRA to be a licensing agreement. Lock Decl., ¶ 5. *See also* Bukolt Decl., ¶ 7.

Furthermore, evidence of trade usage demonstrates that it is commonplace for sales terminology to be used in connection with software licensing agreements. Mr. Lock states:

> In my extensive experience, I have found that virtually all end-users do not buy—but rather receive a license for—software. The industry uses terms such as "purchase," "sell," "buy," etc.... because they are convenient and familiar, but the industry is aware that all software, including Adobe's software, is distributed under license.

Lock Decl., ¶ 7. The other declarants offer similar testimony. *See* Bukolt Decl., ¶ 11; Gentile Decl., ¶ 6; Webster Decl., ¶ 8; and Grant Decl., ¶¶ 9–10.

Lastly, experts in the field explain why licensing is the preferred method of distributing software. Mr. Nimmer initially notes that with the exception of video games, software is licensed rather than sold. Nimmer Decl., ¶ 4. Mr. Nimmer goes on to explain:

> Licenses allow the software industry to distribute products that reflect market demands and the property interests of

**3.** The Court notes that these signatories to the OCRA did not distribute Adobe software to One Stop. The Court, nevertheless, finds their declarations persuasive because they illustrate the intentions of at least some resellers who are parties to the OCRA.

the information owner in a much more precise and helpful way than would sales of copies of the software. Thus, by using a license format, the software publisher can market products focused on single-user markets separately from products for use in multi-user commercial networks. In fact, in many cases, the **sole factor** that distinguishes between a single user and a multi-user product lies in the license terms that indicate to the licensee what uses it can make of the information it obtained. The license *is* the product since the underlying program may be identical in each case. Nimmer Decl., ¶¶ 6–7. Amy Grant, founder of License Solutions, a company which advises clients on software-related licensing issues, reiterates Mr. Nimmer's testimony: "[i]n my experience, **no software company** ever sells its software, with the occasional exception of some CD–ROMs which are included as an ancillary feature with books." Grant Decl., ¶ 16. Relying on Gene K. Landy's, *The Software Developer's and Marketer's Legal Companion,* she explains that "software companies license because they need the control that licensing affords. The rate of change of technology is orders of magnitude greater than the ability of intellectual property laws to keep up. The industry must be able to license its products in order create and protect innovation." Grant Decl., ¶ 18.

In addition to the use of sales terminology, the only other evidence One Stop relies upon in support of its interpretation of the OCRA as a sales agreement is the following deposition testimony from a representative of Programmers Paradise, an Adobe-authorized educational reseller which distributed software to One Stop:

Q: In your industry does the word purchase have a special meaning when applied to software, as you understand it?

A: Not my understanding necessarily. Purchased, just acquired by.

One Stop's February 18, 1999, Decl., ¶ 4. In light of the evidence presented by Adobe, the Court finds the testimony of the Programmers Paradise representative of "insufficient caliber or quantity to allow a rational finder of fact" to find that the OCRA is a sales agreement. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In conclusion, the Court holds that based upon the undisputed evidence submitted by Adobe regarding the intent of the parties in entering into the agreement, trade usage, the unique nature of distributing software, as well as the express restrictive language of the contract, the OCRA is a licensing agreement. Thus, contrary to One Stop's assertions, the OCRA does not represent a first sale between the reseller and Adobe. One Stop's failure to trace its Adobe products to a sale renders the first sale doctrine inapplicable and subjects One Stop to potential liability under copyright law.

**B. Copyright Infringement**

■ As discussed above, 17 U.S.C. § 106(3) grants a copyright holder the exclusive right to distribute its copyrighted work. A common method of distribution is through licensing agreements, which permit the copyright holder to place restrictions upon the distribution of its products. "A licensee infringes the owner's copyright if its use exceeds the scope of its license." *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1087 (9th Cir.1989) (citing *Gilliam v. American Broadcasting Cos.,* 538 F.2d 14, 20 (2nd Cir.1976)).

■ The Court initially notes that while One Stop is not a signatory to an Adobe licensing agreement, it is nevertheless subject to the restrictions of those agreements. In *Microsoft v. Harmony Computers & Electronics,* 846 F.Supp. 208, 213 (E.D.N.Y.1994), the court found that "[t]o the extent that defendants bought their Microsoft Products from authorized Microsoft licensees, they were subject to the same licensing restrictions under which those licensees operated." According to One Stop, its main source for educational

versions of Adobe software was Programmers Paradise, an Adobe-authorized educational reseller and consequently a signatory to the OCRA. One Stop's February 18, 1999 Decl., ¶ 4. Thus, by obtaining Adobe software from a party to an Adobe licensing agreement, One Stop was bound by any restrictions imposed by that agreement.

■ The OCRA specifically permits the reseller to distribute "solely to Educational End Users at Reseller's Outlet or through reseller's · direct sales force." OCRA, ¶ 3(a)(iii). In his January 21, 1999 deposition, Lawrence Firestone, the President of One Stop, admits to adulterating educational versions of Adobe software and re-packaging them as full retail versions. In the following portion of his testimony Mr. Firestone unequivocally admits to distributing those mislabeled versions to non-educational end users:

Q: Why did One Stop take educational software and distribute it to non-educational end users?

A: If the customer asked for it and I'm in business to make money, that's what I would do.

Q: You didn't think there was anything suspicious about it?

A: Not at the time, no—no.

Q: You didn't think there was anything wrong with taking educational labeled software and distributing it to non-educational end users?

A: No.

Oliver Decl.Ex. L, at 127, ll. 3–16. One Stop's admitted distribution of educational versions of Adobe software to non-educational end users is manifestly outside the scope of Adobe's license and in violation of its right to distribute under § 106(3). Accordingly, the Court finds that One Stop has committed copyright infringement as a matter of law under § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 ... is an infringer of the copyright.")

C.  Trademark Infringement

■ On March 31, 1999, the Court issued an order granting Adobe summary adjudication of its trademark infringement claim with respect to the adulterated versions of Adobe educational software distributed by One Stop. Adobe now seeks summary adjudication of its federal trademark infringement claim based upon One Stop's distribution of unadulterated versions.[4]

Section 1114(1) provides:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant....

Adobe argues that One Stop violated § 1114 by distributing unadulterated educational versions in violation of its quality control standards. In support of its argument Adobe relies upon *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 ("A product is not truly 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer."). Defendant Commercial Petroleum was a licensed distributor of Shell's motor oil. Shell placed numerous quality control measures upon its licensed distributors to insure the quality of its oil. Shell filed a trademark infringement suit against Commercial for distributing the oil under the Shell trademark without com-

---

4. As in copyright law, trademark law also contains the first sale doctrine. *See Denbicare U.S.A. Inc. v. Toys R US, Inc.*, 84 F.3d 1143, 1151 (9th Cir.1996). The Court notes that for the reasons outlined in the above discussion, the doctrine is equally inapplicable to Adobe's trademark infringement claims.

**1094**

plying with its quality control measures. The Fourth Circuit upheld the district court's finding that Commercial's activities were in violation of trademark law.

The Court finds *Shell Oil* distinguishable from the case at bar. Shell required its licensees to maintain certain storage facilities and transportation measures to prevent contamination of the oil. These standards related directly to the quality of the motor oil, thus Commercial's non-compliance threatened the integrity of Shell's product. Adobe fails to identify any comparable measures it imposed upon distributors to guarantee the quality of its software. Moreover, Adobe fails to present evidence of how One Stop's activities affected the quality of its software. The mere distribution by One Stop of admittedly unadulterated software is insufficient to establish trademark infringement under *Shell Oil.* Thus, the Court denies Adobe's motion for summary adjudication of the § 1114(1) claim with respect to the unadulterated Adobe software purchased and distributed by One Stop.

### V. CONCLUSION

Based upon the foregoing, the Court orders as follows: (1) Defendant One Stop's motion for summary judgment is denied; (2) Plaintiff Adobe's motion for summary adjudication of count 1 for copyright infringement is granted; and (3) Plaintiff's motion for summary adjudication of count 3 for trademark infringement relating to the unadulterated versions of Adobe educational software is denied.