**ADOBE SYSTEMS INC., Plaintiff,**

v.

**STARGATE SOFTWARE INC., et al, Defendants.**

No. C 99–20284 JW.

United States District Court,
N.D. California,
San Jose Division.

Aug. 16, 2002.

Ian N. Feinberg, L. Scott Oliver, Megan R. Whyman, Gray Cary Ware & Freidenrich, LLP, Palo Alto, CA, for plaintiff.

Douglas W. Beck, Tuttle & Taylor, Los Angeles, CA, Gary L. Azorsky, Mesirov Gelman Jaffe Cramer & Jamieson, LLP, Philadelphia, PA, Gary L. Azorsky, Schnader. Harrison Segal & Lewis, Philadelphia, PA, Michael A. Topp, Rimac & Martin, San Francisco, CA, Joseph M. Rimac, Jr, Mound, Cotton and Wollan, San Francisco, CA, for defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WARE, District Judge.

### I. INTRODUCTION

Plaintiff, Adobe Systems Inc., ("Adobe") filed this action against Defendant, Stargate Systems Inc., ("Stargate") for copyright infringement of Adobe's educational software. Presently before the Court are the Parties' Cross–Motions for Summary Judgment. Based upon all papers filed to date and oral argument of counsel at the hearing, Stargate's Motion for Summary Judgment is DENIED and Adobe's Motion for Summary Judgment is GRANTED.

### II. BACKGROUND

Adobe is one of the leading software development and publishing companies in the United States. Some of its copyrighted software products include Adobe Illustrator, Adobe Pagemaker, and Adobe Acrobat. Adobe contends that it distributes its software products under license to a network of distributors and original equipment manufacturers. These distributors sign license agreements that permit them to engage in limited re-distribution to entities or individuals authorized by Adobe. Adobe claims all Adobe software products are subject to a shrink-wrap End User License Agreement ("EULA") that prohibits copying or commercial re-distribution.

Adobe also makes "Educational" versions of its software packages available for license to students and educators at a discount. Adobe Educational distributors are licensed· to transfer Educational software only to resellers who have signed Off or On Campus Educational Reseller Agreements ("OCRA") with Adobe. In turn, the OCRA requires that re-distribution of Educational software be limited to students and educators. Adobe claims that the Educational versions are prominently marked "Education Version—Academic ID Required" and include the legend, "Notice to users: Use of the enclosed software is subject to the license agreement contained in the package."

Stargate is a discount software distributor wholly owned by Leonid Kelman. Neither Stargate nor Mr. Kelman are authorized distributors of Adobe products. In 1995, Mr. Kelman co-founded a software distribution company called Action Software with Alexander Belfer. Together they incorporated Stargate Software Inc. In 1997, Stargate began acquiring software from two businesses, Dallas Computer and D.C. Micro, with the majority of the software being Adobe Educational software. Adobe contends that Stargate's suppliers acquired Adobe Educational software from Adobe · Educational distributor Douglas Stewart Co. pursuant to valid OCRAs. However, Stargate alleges that all of the Adobe software products that Stargate

sold were purchased through either D.C. Micro, Inc. or Dallas Computers, Inc.

Between March 1998 and April 1999, Stargate, purchased between 1795–2189 packages of "Educational" software produced by Adobe. Stargate distributed this Educational software at below-market prices to retail customers and unauthorized resellers through magazine advertisements, trade shows, action websites and its website "www.stargatesoftware.com." Adobe learned of this practice, made a trap purchase of the Educational software in April 1999, and filed suit in this Court against Stargate and Mr. Kelman soon thereafter.

Adobe alleges that Stargate infringed Adobe's copyrights by obtaining and selling Educational versions of Adobe software without Adobe's authorization. Stargate contends that it was the rightful owner of the Adobe software products and therefore did not infringe Adobe's copyright by reselling those products, pursuant to the "first sale" doctrine, codified at 17 U.S.C. § 109. Presently before the Court are the Parties' Cross–Motions for Summary Judgment.

### III. STANDARDS

Summary Judgement is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R.Civ.P. 56 ©. The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If it meets this burden, the moving party is entitled to judgment as a matter of a law when the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it bears the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law ... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and the weight to be accorded particular evidence. *Mason v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348; *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 630 (9th Cir.1987). It is the court's responsibility "to determine whether the 'specific facts' set forth by the non-moving party, coupled with undisputed background or

contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec.Serv.*, 809 F.2d at 631. "[S]ummary judgement will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## IV. DISCUSSION

### A. Copyright Infringement Claim

 Section 106 of the Copyright Act (the "Act") outlines the exclusive rights enjoyed by owners of a copyright including the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Under this provision, the copyright owner would have the "right to control the first public distribution of an authorized copy or phonorecord of his work, whether by sale, gift, loan, or some rental or lease arrangement." 17 U.S.C. § 106(3). Section 109(a) of the Act, makes clear that "the copyright owner's rights under § 106(3) cease with respect to a particular copy or phonorecord once he has parted with *ownership* of it." 17 U.S.C. § 109(a) (emphasis added). Also pursuant to § 109(a), "the *owner* of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a) (emphasis added). One significant effect of § 109(a) is to limit the exclusive right to distribute copies to their first voluntary disposition, and thus negate copyright owner control over further or "downstream" transfer to a third party. *Quality King Distrib. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 118 S.Ct. 1125, 140 L.Ed.2d 254 (1998). Thus, under the first sale doctrine, "a sale of a lawfully made copy terminates a copyright holder's authority to interfere with subsequent sales or distribution of that particular copy." *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 480 (9th Cir.1994). "[T]he copyright owner is entitled to realize no more and no less than full value of each copy or phonorecord upon its disposition." *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F.Supp. 1378 (C.D.Cal.1993).

### A. Sale or License

The issue before the Court is whether Adobe, through its OCRA and EULA, transferred *ownership* of each particular copy of its software to its distributors D.C. Micro and Dallas Computers. Having transferred such ownership would bar Adobe from claiming copyright infringement by Stargate under the first sale doctrine. An issuance via license, however, would not. Rather, the establishment of a license by Adobe would protect Adobe under the first sale doctrine.

Implicably, Stargate concedes that Adobe retains title to the objective coded software of the intellectual property contained on the CD–ROM. Nevertheless, Stargate claims, however, that whenever there is a sale, Adobe has parted with title to that particular copy of its copyrighted intellectual property, thereby divesting itself of the exclusive right to vend that particular copy. In essence, Stargate contends that each time Adobe is paid by a distributor or reseller for a package of software, it has "received its rewards" for that package and has parted with title to

that particular copy. Stargate argues that after examining the "economic realities" of the initial transaction between Adobe and its distributors, Adobe's distribution of its educational software constitutes a sale, rather than a license of each particular copy.

Stargate further alleges that nowhere in either the OCRA or in the EULA, does Adobe purport in any manner to retain title to that particular copy of its software, that is, the package including a CD–ROM on which the program is stored, and any manuals or other materials included within it. Therefore, Stargate argues that further transfers of that package do not infringe Adobe's copyright.

Adobe contends, on the other hand, that "a common method of distribution for software products is through licensing agreements, which permit the copyright holder to place restrictions upon the distribution of its products." *Adobe Systems, Inc. v. One Stop Micro*, 84 F.Supp.2d 1086, 1092 (N.D.Cal.2000). Adobe alleges that Mr. Kelman, Stargate's sole owner, was aware that Adobe's software is distributed pursuant to licensing agreements. Kelman Deposition at 223:1–13. Specifically, Kelman testified that, "I've seen that there was a licensing agreement (in the software box)." Kelman Deposition at 233:9–13. Furthermore it was Adobe's intent to license the software rather than to make an outright sale. According to Adobe, "Adobe does not sell its software. Instead, Adobe distributes its software products under license to a network of distributors …" Navarro Declaration ¶¶ 3–4, Exhibits A and B.

Adobe also argues that under the Act, the first sale doctrine does not turn on whether the copyright owner "received its reward" for a particular piece of software, but whether the software has been *sold*. In this case, Adobe has elected to distribute its products via license rather than

sale. Adobe alleges that their OCRA and EULA are clearly licenses. According to Adobe, multiple restrictions on title are placed on each distributor through the express terms of its OCRA. Additionally, Adobe asserts that it was their intention to affect a license agreement, through their OCRAs, rather than a sale.

### 1. The term "Software"

In this case, it is important to draw a distinction between the objective code "software" and the medium and packaging through which it is sold on the market. Section 202 of the Act recognizes a distinction between tangible property rights in copies of the work and intangible property rights in the creation itself. "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202. In this case, both Parties are in agreement that Adobe is the rightful owner of the intangible portion of the software, i.e. the intellectual property.

The dispute arises, however, as to who is the rightful owner of the package, or physical manifestation of this intellectual property. The CD–ROM itself is worth not much more than a nominal amount, and it is the code that justifies the purchase price of the product. That being the case, the economic reality of this transaction is that a consumer is ultimately paying for the software contained on the CD–ROM, rather than the CD–ROM itself. Despite this fact, this case is still based on the *ownership* of each particular copy of software distributed by Adobe. The determination of ownership in turn is based primarily on an examination of the OCRA, the agreement between Adobe and its distributors.

### 2. The OCRA

█ The Court looks to the language, content, and intent of the OCRA, in deter-

mining whether its terms affect a sale or license of the software. In the OCRA, Adobe contends that "Adobe is the owner and developer of Adobe Educational Software Products." *See* Bloch Declaration ¶ 7, Exhibit F: ("OCRA"), preamble. According to the OCRA, "Educational Software Products," consist of "the respective software program in object code ('Software'), supporting documentation ('Documentation'), and all other related material, if any, supplied to Reseller in a commercial package." OCRA ¶ 1(d). Adobe characterizes each transaction it concluded throughout the entire stream of commerce relevant to this action as a license. Accordingly, Adobe argues that it retains ownership of its software, the accompanying documentation, and all other related materials pursuant to the OCRA.

### a. *Terminology*

In *One Stop Micro, supra,* Adobe filed suit against One Stop, a software distributor for copyright infringement, claiming that One Stop was illegally distributing copies of its software intended for educational end users to the general public. *See Id.* The OCRA and EULA in *One Stop* are substantially similar to the agreements relevant to this case. In *One Stop,* the Court found in favor of Adobe and held that (1) the agreement under which the software was distributed was a licensing agreement; and, (2) the license agreement applied to the distributor, even though it was not a signatory of the OCRA. *Id.*

Stargate argues, however, that the language of Adobe's OCRA is evidence of a sale rather than a license. For example, in ¶ 11(c)(iv)(A), the OCRA reads, "Reseller shall submit to Adobe within (10) ten days after the effective date of termination a summary of the number of the respective Educational Software Products *owned by Reseller* as of the effective date of termination." OCRA ¶ 11(c)(iv)(A) (emphasis added). Also in the same paragraph is a sentence that provides, "Adobe may, at its option *repurchase* any or all of such Educational Software Products from Reseller upon written notice of its intention to do so ..." OCRA ¶ 11(c)(iv)(A) (emphasis added). The question arises therefore, as to whether this language creates a sale, or a license of the product. The Court in *One Stop* concluded that "The OCRA contains additional language indicating that it only confers a license." *One Stop Micro,* 84 F.Supp.2d at 1090.

Similarly, the Court in this case also concludes that the language in Adobe's OCRA is evidence of a license, rather than a sale. Although the OCRA contains language such as "repurchase" and "owned," additional language indicates that the OCRA only confers a license. For instance, Paragraph 9 of the OCRA is titled, *"Ownership* of Proprietary Rights and Nondisclosure" (Referring to Adobe) OCRA ¶ 9 (emphasis added). Under that same paragraph, the OCRA furthers states, "Reseller acknowledges that the structure and organization of the *Software is proprietary to Adobe* and that *Adobe retains exclusive ownership of the Software* and Trademarks." OCRA, ¶ 9 (emphasis added). The OCRA further states, "Reseller ... to *protect Adobe's proprietary rights* in the Educational Software Products. Except as provided herein, *reseller is not granted any rights* to patents, copyrights, trade secrets, trade names, trademarks (whether registered or unregistered), or any other rights, franchises, or licenses with respect to the Software or Educational Software Products." OCRA, ¶ 9 (emphasis added). As explained by the Court in *One Stop,* "evidence of trade usage demonstrates that it is commonplace for sales terminology to be used in connection with software licensing agreements." *One Stop Micro,* 84 F.Supp.2d at 1091. This Court concurs.

b. *Content*

After examining the contents of the OCRA, as well as its express terms, it is clear that the agreement outlines numerous restrictions on title that are imposed upon the reseller regarding the distribution of its software. For example in the OCRA, ¶ 3, Adobe premises their restrictions with the following statement, "Reseller shall have the right to purchase Educational Software Products from Adobe or authorized Adobe distributors who carry the Educational Software Products and to distribute the Educational Software Products so long as *it remains in compliance with all of the following conditions.*" OCRA, ¶ 3 (emphasis added).

The Court in *One Stop* stated, "These numerous restrictions imposed by Adobe indicate a license rather than a sale because they undeniably interfere with the reseller's ability to further distribute the software." *One Stop Micro*, 84 F.Supp.2d at 1091. The Court in *One Stop* found the following restriction set forth in Adobe's OCRA in ¶ 3(a)(ii) particularly compelling: *"Reseller distributes pursuant to the terms and conditions of the then current applicable Software Product [EULA]."* OCRA ¶ 3(a)(ii) (emphasis added).

As explained by the court in *One Stop, supra,* the EULA is a shrink-wrap license agreement which accompanies every Adobe software product. The EULA states that "Adobe grants to you a nonexclusive license to use the Software and Documentation," provided that the user agrees to certain restrictions. EULA, preamble. The Court in *One Stop* concluded that under the EULA, the end user was only granted a license to use the software. Adobe's specific incorporation of the EULA into the OCRA indicates that the reseller obtains a license, rather than actual ownership of the product in question. The Court in *One Stop* stated, "It would be incongruous to conclude that ed-

ucational resellers are owners of the Adobe educational versions, while the end users who the resellers distribute to are granted a mere license." *One Stop Micro,* 84 F.Supp.2d at 1091.

Similar to the OCRA at issue in *One Stop,* the OCRA in this case contains multiple restrictions that limit the reseller's ability to distribute Adobe's software. Specifically, pursuant to the terms of the OCRA, the Reseller promises to:

(1). Not distribute outside the country in which its principal place of business is located. OCRA, ¶ 3(a)(i);

(2). Distribute solely to Educational End Users at Reseller's Outlet or through Reseller's direct sales force. OCRA, ¶ 3(a)(iii);

(3). Require each Educational End User to provide identification as follows: (1) in the case of a purchase by an individual, a valid photo ID or such other identification as is used by the educational institution for faculty, staff, or students, or (2) in the case of a purchase by an entity, an official purchase order indicating the name of the entity. OCRA, ¶ 3(a)(iv);

(4). Distribute the Educational Software Products solely in the form obtained from Adobe. OCRA, ¶ 3(a)(v);

(5). Provide adequate service and support in connection with the distribution of the Educational Software Products. OCRA, ¶ 3(a)(vi);

(6). Agree not to distribute the Educational Software Products other than pursuant to the provisions of the EULA and, by way of illustration but not of limitation, shall not be entitled to grant any form of site license for Education Software Products. Reseller agrees not to

distribute the Educational Software Products without prior written approval from Adobe (I) by mail order, (ii) by rental or lease, (iii) in bulk for redistribution, (iv) with knowledge or reason to know that the Educational Software Products will be transported outside the country in which a Software Product is provided to an Educational End User, or (v) to other Educational Resellers or other dealers, resellers, or redistributions. OCRA, ¶ 3(b); and

(7). Promises that the reseller's rights in Educational Software Products used for demonstration purposes shall be subject to the terms and conditions of the respective EULA, which are hereby incorporated by reference. OCRA, ¶ 3(c).

In light of the fact that the OCRA in this case is substantially similar to the OCRA in *One Stop,* this Court agrees that the OCRA in the present case contains numerous restrictions on title that are imposed on the reseller, limiting the reseller's ability to re-distribute Adobe software, and thereby conferring a license between Adobe and the reseller. It is clear to the Court that the terms of the OCRA substantially and undeniably interfere with a reseller's ability to distribute and/or convey title to the products in question. 17 U.S.C. § 106.

### c. *Softman v. Adobe*

Stargate, however, cites *Softman Products Company v. Adobe Systems Inc.,* 171 F.Supp.2d 1075 (C.D.Cal.2001) for the proposition that the OCRA in this case constitutes a sale, rather than a license. In *Softman,* a case arising out of the United States District Court for the Central District of California, Softman, a computer software distributor brought an action against Adobe. Adobe counterclaimed, alleging copyright infringement. Adobe claimed that Softman distributed unauthorized copies of Adobe software, including Adobe's Educational software and illegally unbundled Adobe "Collections." The court stated, "If a transaction involves a single payment giving the buyer an unlimited period in which it has a right to possession, the transaction is a sale." *Id.* at 1086. The *Softman* court held the nature of the transaction between Adobe and its distributor was a sale and Softman was thus protected by the first sale doctrine.

This Court respectfully declines to adopt the *Softman* analysis. Although the court in *Softman,* stated, "The Court understands fully why licensing has many advantages for software publishers," it concluded that the transaction between the parties constituted a sale. *Id.* at 1087. In this case, however, the Court reaches a different conclusion.

The facts involved in *Softman* are distinguishable from this case. The court in *Softman* dealt with the question of whether the purchaser of a retail collection of Adobe software can re-distribute the collection's constituent parts. *Softman,* 171 F.Supp.2d at 1079–80. In *Softman,* the court noted that the terms of the Adobe EULA prohibited licensees from transferring or assigning any individual Adobe product that was originally distributed as part of a Collection, *unless* it was transferred with all the software contained in that original Collection. *Softman Products,* 171 F.Supp.2d at 1083. In *Softman,* it was uncontested by the Parties that the constituent parts were re-distributed in that prohibited manner. In contrast, the present case involves the re-distribution of Adobe software, with no substantial evidence of adulteration or the illegal unbundling of software.

Furthermore, this Court notes that, within the context of this case, when a

"single payment" is made for a particular copy of software, the payment is being made for the value of the objective code that is burned on the CD–ROM. Absent this "valuable" information and intellectual property, a CD–ROM would be almost worthless. The true economic value of the product is derived from the intellectual property embodied within it.

This Court notes that software is unique from other forms of copyrighted information. Technology and software, in particular, has radically transformed the way information is created and exchanged. Software fundamentally differs from more traditional forms of medium, such as print or phonographic materials, in that software can be both, more readily and easily copied on a mass scale in an extraordinarily short amount of time and relatively inexpensively. One of the primary advantages of software, its ability to record, concentrate and convey information with unprecedented ease and speed, makes it extraordinarily vulnerable to illegal copying and piracy. This Court finds that it is important to acknowledge these special characteristics of the software industry and provide enhanced copyright protection for its inventors and developers.

Lastly, as a matter of general principle, this Court finds that no colorable reason exists in this case as to why Adobe and its distributors should be barred from characterizing the transaction that has been forged between them as a license. In light of the restrictions on title that have been incorporated into the OCRA, as well as the Parties' free and willing consent to enter into and execute its terms, the Parties should be free to negotiate and/or set a price for the product being exchanged, as well as set the terms by which the product is exchanged. *Gray v. American Exp. Co.,* 743 F.2d 10 (D.C.Cir.1984). Fundamental to any free society is the liberty of its members to formulate contracts in accordance with the terms that they agree and consent to mutually execute. "The right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to the society as the right to write and to speak without restraint." *Blount v. Smith,* 12 Ohio St.2d 41, 231 N.E.2d 301 (1967). While exceptions are made in the case of unfair or exploitive contracts, or where an inequitable end results as a result of the agreement, commercial parties are generally free to contract as they desire. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001 (3d Cir.1980).

### 3. *The EULA*

Furthermore, the Court finds that Adobe's EULA contains significant restrictions on title that provides additional evidence that the relevant transaction between Adobe and its distributors is a license, rather than a sale. For example, the EULA states the following:

(1). "THIS IS A CONTRACT. BY OPENING THIS PACKAGE YOU ACCEPT ALL THE TERMS AND CONDITIONS OF THIS AGREEMENT." EULA, preamble.

(2). "This package contains software ('Software') and related explanatory written materials ('Documentation')." EULA, preamble.

(3). "Adobe grants to you a nonexclusive license to use the Software and Documentation, provided that you agree to the following." EULA, preamble.

(4). "The Software is *owned* by Adobe and its suppliers." EULA, ¶ (2) (emphasis added).

This Court in *One Stop* stated that, "... under the EULA the end user is only granted a license to use the software. Adobe's specific incorporation of the

EULA indicates that the reseller obtains a license. It would be incongruous to conclude that educational resellers are owners of the Adobe educational versions, while the end users who the resellers distribute to are granted a mere license." *One Stop Micro,* 84 F.Supp.2d at 1091.

Due to the substantially similar nature and terms of the EULA in both cases, this Court adopts the analysis used in *One Stop.* Like the EULA in *One Stop,* the EULA in this case maintains numerous restrictions on title with respect to the end user. Furthermore, it clearly states at the top of the agreement that it is a license agreement. Though, the EULA is packaged inside the box, the end user is given the opportunity to return the package if he or she is not in agreement with the terms of the contract. It is clear that Adobe, through the express terms of its EULA, intended and attempted openly and in good faith to maintain proprietary ownership over its product, as well as preserve its rights to title.

The Court, therefore, concludes that based on the clear and unambiguous language of the relevant contracts, coupled with the multiple restrictions on title placed on the reseller in the above agreements, the transaction should be characterized as a license, rather than a sale.

## V. CONCLUSION

For all of the aforementioned reasons, Defendant, Stargate's Motion for Summary Judgment is DENIED and Plaintiff, Adobe's Motion for Summary Judgment is GRANTED.