**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WALL DATA INCORPORATED,
　　　　　*Plaintiff-Appellee,*

　　　　　v.

LOS ANGELES COUNTY SHERIFF'S
DEPARTMENT, a division of the
COUNTY OF LOS ANGELES;
COUNTY OF LOS ANGELES,
　　　　　*Defendants-Appellants.*

No. 03-56559

D.C. No.
CV-02-00301-RGK

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
April 7, 2005—Pasadena, California

Filed May 17, 2006

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
and Stephen S. Trott, Circuit Judges.

Opinion by Judge Pregerson

**COUNSEL**

Dennis G. Martin, Blakely, Sofoloff, Taylor & Zafman, Los Angeles, California, for the defendants-appellants.

Tod L. Gamlen, Baker & McKenzie, Palo Alto, California, for the plaintiff-appellee.

**OPINION**

PREGERSON, Circuit Judge:

The Los Angeles County Sheriff's Department purchased 3,663 licenses to Wall Data's computer software,[1] but

---

[1] We use the terms "computer software," "software application," and "computer program" interchangeably.

installed the software onto 6,007 computers. We are asked to determine whether the Sheriff's Department's conduct constituted copyright infringement. The wrinkle in this otherwise smooth question is that, although the software was installed onto 6,007 computers, the computers were configured such that the total number of workstations able to access the installed software did not exceed the total number of licenses the Sheriff's Department purchased. We have jurisdiction under 28 U.S.C. § 1291 and hold that such copying constitutes copyright infringement despite the Sheriff's Department's configuration. We therefore affirm the district court.

## I.  FACTS AND PROCEDURAL HISTORY

Plaintiff-Appellee Wall Data Incorporated develops, markets, and sells a line of copyrighted computer terminal emulation software products including RUMBA Office and RUMBA Mainframe. Both RUMBA products allow personal computers that use one operating system to access data stored on computers that use a different operating system. RUMBA Office is the more expensive and more powerful computer program.

Between December 1996 and February 1999, the Appellants-Defendants, the Los Angeles County Sheriff's Department and the County of Los Angeles (collectively, "Sheriff's Department"), purchased both of Wall Data's RUMBA software products through an approved vendor. In December 1996, the Sheriff's Department purchased eight "units" of Wall Data's RUMBA Office program. Each of the eight units contained a RUMBA Office CD-ROM (compact disc read-only-memory) and a volume license booklet. Each volume license booklet granted the Sheriff's Department 250 licenses to RUMBA Office. In total, the Sheriff's Department paid $175,220 for 2,000 RUMBA Office licenses, at a reduced price of $87.61 per license.[2]

---

[2]The Sheriff's Department argues that it bought 2,000 *copies* of the software, while Wall Data claims that the Sheriff's Department bought 2,000 *licenses* to the software. As discussed below, we conclude that the Sheriff's Department bought licenses to, not copies of, Wall Data's software.

Between November 1997 and February 1999, the Sheriff's Department purchased 1,628 licenses to the lower-cost RUMBA Mainframe program. In all, the Sheriff's Department purchased 2,035 licenses to RUMBA Office and 1,628 licenses to RUMBA Mainframe, for a total of 3,663 licenses.

At first, the Sheriff's Department installed RUMBA Office manually, one computer at a time, onto approximately 750 computers in the Sheriff's Department's new detention facility — the Twin Towers Correctional Facility ("Twin Towers"). The Sheriff's Department soon realized that this process was too time consuming and would delay opening the Twin Towers. In addition, it was not clear where those employees who would need to use RUMBA programs would be assigned to work. To speed up the process of installation and to ensure that employees would be able to use the RUMBA software regardless of where they were assigned, the Sheriff's Department decided to install a "baseline" of software applications onto the hard drives of the remaining computers in its new detention facility. This was done by simultaneously copying the entire contents of a single "master" hard drive containing the baseline of software applications onto the hard drives of other computers. This method is known as "hard disk imaging," and saved the Sheriff's Department from having to install the software manually onto each computer.

By the time the Sheriff's Department finished hard disk imaging in mid-2001, RUMBA Office was loaded onto 6,007 computers in the Twin Towers, far in excess of the 3,663 RUMBA licenses the Sheriff's Department had purchased. Although RUMBA Office was installed onto nearly all of the computers in the Twin Towers, the Sheriff's Department configured those computers using a password-based security system such that the number of users who could access RUMBA Office was limited. The Sheriff's Department claims that, at

all times, the number of those who could access the software was limited to the number of licenses it had.[3]

Shortly thereafter, Wall Data discovered that the number of computers in the Twin Towers that had RUMBA Office installed exceeded the number of licenses held by the Sheriff's Department. As a result, Wall Data claimed that the Sheriff's Department violated the terms of its licenses because the Sheriff's Department was licensed, at most, to install RUMBA software onto only 3,663 computers.

The parties tried unsuccessfully to settle the dispute. After settlement efforts failed, the Sheriff's Department removed RUMBA Office from the computers in the Twin Towers for which it did not have a license. The Sheriff's Department installed the less expensive RUMBA Mainframe program onto many computers to replace the copies of RUMBA Office that were removed.

On January 11, 2002, Wall Data filed suit against the Sheriff's Department. Although Wall Data raised several claims in its complaint, the only claim that went to trial (and the only claim at issue here) was copyright infringement. Wall Data alleged that the Sheriff's Department "over-installed" RUMBA Office onto computers in the Twin Towers and vio-

---

[3]Specifically, a Sheriff's Department computer network administrator would limit user access to the RUMBA Office program by assigning "logical units" to each computer workstation. These logical units were unique identification numbers that the workstation electronically presented to the host computer. The host computer would then determine whether the electronic identification number matched one of the workstations authorized to communicate with the host computer through the RUMBA software. If the workstation was not on the list of assigned logical units, the installed copy of the RUMBA software would remain installed, but unused, in the hard drive of that workstation. Hard drive imaging ensured that employees could access RUMBA software on any workstation in the facility, so long as that workstation had been assigned a logical unit by the network administrator.

lated the terms of Wall Data's shrink-wrap license,[4] click-through license,[5] and volume license booklets.

In response, the Sheriff's Department contended that it had not violated the terms of Wall Data's licenses and that it was entitled to the following affirmative defenses: (1) a "fair use" defense under 17 U.S.C. § 107; and (2) an "essential step" defense under 17 U.S.C. § 117(a)(1). As described above, the Sheriff's Department argued that, even though it had installed RUMBA Office onto 6,007 workstations, it had configured the software so that the software could only be accessed by 3,663 workstations at a time. The Sheriff's Department argued that this constituted a fair use under 17 U.S.C. § 107 because the number of "useable" copies of the software did

_____

[4]A shrink-wrap license is a form on the packing or on the outside of the CD-ROM containing the software which states that by opening the packaging or CD-ROM wrapper, the user agrees to the terms of the license. *See, e.g.*, *Specht v. Netscape Commc'n Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002).

[5]A "click-through license" is a form embedded in computer software which requires the person initially installing the software onto a computer to affirmatively click a box or an "accept" button indicating that the user accepts the terms of the license in order to complete the software installation and to use the software after it is installed. *See, e.g., SoftMan Prods. Co. v. Adobe Sys. Inc.*, 171 F. Supp. 2d 1075, 1080 (C.D. Cal. 2001). The grant clause of the standard RUMBA click-through license at the time of the 1996 purchase stated that:

> Wall Data . . . grants you ("You"), the end user, a non-exclusive license to use the enclosed software program . . . on a single Designated Computer for which the software has been activated. A "Designated Computer" is either (i) a stand-alone workstation, or (ii) a networked workstation which does not permit the Software to be shared with other networked workstations. You may not use the Software in any other multiple computer or multiple user arrangement. You may not use the Software other than on a Designated Computer, except that You may transfer the Software to another Designated Computer and reactivate it for use with such other Designated Computer not more than once every 30 days, provided that the Software is removed from the Designated Computer from which it is transferred.

not exceed the number of licenses held by the Sheriff's Department. The Sheriff's Department also argued that the copying was an "essential step" under 17 U.S.C. § 117(a)(l), because the hard drive imaging process was a necessary step of installation. Based on these arguments and affirmative defenses, both parties moved for summary judgment.

The district court made its initial ruling on the parties' summary judgment motions on May 2, 2003, and concluded that neither party was entitled to summary judgment. On May 15, 2003, both sides filed numerous motions *in limine*. The district court ruled on these motions on June 17, 2003; it excluded evidence offered by the Sheriff's Department on its fair use defense, and other evidence that the district court ruled irrelevant, time consuming, or confusing to the jury. On the same day, the district court reconsidered its earlier ruling on summary judgment, and granted Wall Data's motion for summary judgment on the basis that the Sheriff's Department was not entitled to a fair use defense.

Following these rulings on the parties' motions *in limine*, a four-day jury trial took place. The only issues remaining for trial were whether the Sheriff's Department had infringed on Wall Data's copyright and whether any defense barred Wall Data's copyright infringement claim. At the end of trial, the jury returned a general verdict finding the Sheriff's Department liable for copyright infringement and awarding Wall Data $210,000 in damages. Subsequently, Wall Data filed a motion under 17 U.S.C. § 505 requesting over $1.5 million in attorneys' fees and nearly $150,000 in costs. The district court granted Wall Data $516,271 in attorneys' fees and approximately $38,000 in costs. After the district court entered final judgment against the Sheriff's Department, the Sheriff's Department timely appealed.

The Sheriff's Department now challenges (1) the district court's order granting summary judgment against its § 107 fair use defense; (2) the district court's evidentiary rulings on

motions *in limine* including those affecting its § 107 fair use defense and § 117 essential step defense; (3) the district court's jury instructions regarding, *inter alia*, the Sheriff's Department's § 117 essential step defense; and (4) the district court's order granting Wall Data costs and attorneys' fees.

## II.  ANALYSIS

The 1976 Copyright Act defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. We have long held that a computer program is copyrightable as a "tangible medium of expression." *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 524-25 (9th Cir. 1984).

As the owner of a copyright, Wall Data has exclusive rights in its copyrighted work. *See* 17 U.S.C. § 106. Exemptions, compulsory licenses, and defenses found in the Copyright Act narrow Wall Data's rights as a copyright owner. *See id.* at §§ 107-122. Here, the Sheriff's Department claims that two defenses found in the Copyright Act apply: the § 107 fair use defense and the § 117 essential step defense. As discussed below, we hold that neither of these defenses save the Sheriff's Department from liability to Wall Data for copyright infringement, and we affirm the district court in full.

### A.  The Sheriff's Department Is Not Entitled to a § 107 Fair Use Defense

For more than a century, courts have excused certain otherwise infringing uses of copyrighted works under the fair use doctrine. *See Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841); Horace G. Ball, The Law of Copyright and Literary Property 260 (1944). The Copyright Act codified the fair use defense and identified six examples of fair uses: "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107.

The fair use defense buttresses the basic goal of copyright law: to put copyrighted works to their most beneficial use so that "the public good fully coincides . . . with the claims of individuals." The Federalist No. 43, at 267 (J. Madison) (New American Library ed. 1961) (1788); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 480 n.33 (1984) ("[W]e must take care to guard against two extremes equally prejudicial; the one, that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits, and the reward of their ingenuity and labour; the other, that the world may not be deprived of improvements, nor the progress of the arts be retarded." (quoting *Sayre v. Moore*, 1 East 361 n.(b), 102 Eng. Rep. 139, 140 n.(b) (K.B. 1785)); *Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792, 799 (9th Cir. 2003) ("At its core, the Act seeks to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works."); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997) (holding that fair use "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster") (citing *Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*, 621 F.2d 57, 60 (2d Cir. 1980)).

In this case, the district court granted summary judgment against the Sheriff's Department on its fair use defense. We review *de novo* the district court's grant of summary judgment. *See Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996). We also review *de novo* the district court's finding of fair use under the Copyright Act, a mixed question of law and fact. *See Mattel*, 353 F.3d at 799.

### 1. The Four Fair Use Factors

To determine whether the Sheriff's Department's use was fair, we must balance four factors. *See id.* at 800. These fac-

tors are: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *See Dr. Seuss*, 109 F.3d at 1399-1404.

Not all of the four factors must favor the Sheriff's Department. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992). As we balance these factors, we bear in mind that fair use is appropriate where a "reasonable copyright owner" would have consented to the use, i.e., where the "custom or public policy" at the time would have defined the use as reasonable. Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, 86th Cong., 2d Sess., Study No. 14, Fair Use of Copyrighted Works 15 (Latman) (Comm. Print 1960).

## 2. Balancing of the Four Fair Use Factors

The Sheriff's Department claims that it is entitled to a fair use defense, because it has done nothing more than apply technology to make the broadest authorized use of its licenses. We are mindful that fair use is a tool for adapting copyright law to brisk technological advances and for tempering the over-technical application of copyright law. Nonetheless, in re-weighing the four fair use factors on appeal, "in light of the purposes of copyright," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994), we conclude that the Sheriff's Department is not entitled to the fair use defense. *See Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 942, *as amended*, 313 F.3d 1093 (9th Cir. 2002) ("As fair use is a mixed question of fact and law, so long as the record is 'sufficient to evaluate each of the statutory factors,' we may reweigh on appeal the inferences to be drawn from that record.") (quoting *Harper & Row, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)).

### a. First Fair Use Factor: Purpose and Character of the Allegedly Infringing Use

**[1]** We first consider the nature of the work: whether the new work is transformative or simply supplants the original work, and whether the work is commercial in nature. *See Campbell*, 510 U.S. at 579.

**[2]** Of primary concern is whether the Sheriff's Department's use was transformative; the more "transformative the new work, the less will be the significance of the other factors." *Id.* A use is considered transformative only where a defendant changes a plaintiff's copyrighted work or uses the plaintiff's copyrighted work in a different context such that the plaintiff's work is transformed into a new creation. *See, e.g., id.* at 578-79. The Sheriff's Department created exact copies of RUMBA's software. It then put those copies to the identical purpose as the original software. Such a use cannot be considered transformative. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) (finding that reproducing music CDs in computer MP3 format is not a transformative use because the resulting use of the copyrighted work was the same as the original use, i.e., entertainment). In cases where " 'use is for the same intrinsic purpose as [the copyright holder's] . . . such use seriously weakens a claimed fair use.' " *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000) (quoting *Weissman v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)).

**[3]** Next, the Sheriff's Department's use of hard drive imaging to copy RUMBA Office did not promote the advancement of knowledge and the arts — goals that copyright intends to secure. "[C]opyright law ultimately serves the purpose of enriching the general public through access to creative works," *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994). But the Sheriff's Department did not "provide the marketplace with new creative works," nor was there any advancement of public knowledge in this case. *Triad Sys.*

*Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1336 (9th Cir. 1995). Thus, allowing such a "fair use" would not further the ultimate goals of copyright law.

[4] Finally, the Sheriff's Department use was commercial in nature. The Sheriff's Department alleges that its use was "commercially insignificant" because not all of the copies of Wall Data's computer software were actually used, and because the Sheriff's Department is a government agency that does not compete with Wall Data. We disagree. As we explained in *Worldwide Church of God*, "repeated and exploitative copying of copyrighted works, even if the copies are not offered for sale, may constitute a commercial use." 227 F.3d at 1118. A commercial use "is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001); *see also Worldwide Church of God*, 227 F.3d at 1118 (concluding that a user is "commercial" where the infringer profited from its infringement because "it gained an 'advantage' or 'benefit' from its distribution and use of [the plaintiff's product] without having to account to the copyright holder").

[5] The terms of Wall Data's RUMBA license clearly restricted the Sheriff's Department's use to a "single designated computer" and prohibited the Sheriff's Department from using "the Software in any other multiple computer or multiple user arrangement." Despite this condition, the Sheriff's Department loaded an entire suite of software, including RUMBA Office, onto nearly all of the computers in the Twin Towers. By using hard drive imaging, the Sheriff's Department saved man-hours and eliminated possible errors associated with separately installing the individual software packages onto each computer in the Twin Tower facility. Hard drive imaging also ensured that those users who needed to use RUMBA would be able to access the software at whatever computer they were assigned to work. Such flexibility

could only have been achieved by purchasing licenses for each of the computers on which the software was loaded, or by negotiating with Wall Data for a less restrictive license. Accordingly, we conclude that "the purpose and character" of the Sheriff's Department's use was commercial, because the copies "were made to save the expense of purchasing authorized copies," *Napster*, 239 F.3d at 1015, or at least the expense of purchasing a more flexible license. Thus, the district court did not err when it decided that the Sheriff's Department's use was not "for a legitimate, essentially non-exploitative purpose," and that the commercial aspect of the Sheriff's Department's use was not "of minimal significance." *Sega*, 977 F.2d at 1522-23.[6]

**[6]** The Sheriff's Department's installation of the RUMBA Office software onto nearly all of its computers in the Twin Towers was not transformative, did not promote an advancement of the arts, and was commercial in nature. The first factor therefore weighs against a finding of fair use.

### b.    Second Fair Use Factor: Nature of the Copyrighted Work

**[7]** In analyzing the second fair use factor, we look at the nature of the copyrighted work, creative works being " 'closer to the core of intended copyright protection' than informational and functional works." *Dr. Seuss*, 109 F.3d at 1402 (quoting *Campbell*, 510 U.S. at 586). Our sister circuits have also considered, under this factor, whether the copyrighted work represents "substantial investment of time and labor . . .

---

[6]To be clear, we do not hold that a fair use defense is not available simply because the infringer uses technology to make efficient use of its licenses. The problematic aspect of the Sheriff's Department's use is that it took in excess of what it bargained for, not that it was technologically efficient. Thus, for example, if the Sheriff's Department had saved time and money by hard drive imaging RUMBA software onto the number of computers for which it had licenses, its "efficiency" would not create a problem.

in anticipation of a financial return." *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981). Although the RUMBA software products are not purely creative works, copyright law nonetheless protects computer software. *See Sega*, 977 F.2d at 1519 ("[T]he 1980 amendments to the Copyright Act unambiguously extended copyright protection to computer programs."). In addition, Wall Data presented undisputed evidence that RUMBA software products were developed over several years, and required a multi-million dollar investment on Wall Data's part. We therefore conclude that the nature of the copyrighted work weighs against a finding of fair use.

### c. Third Fair Use Factor: Amount and Substantiality of the Portion Used

[8] Next, we consider whether the "amount and substantiality of the portion used in relation to the copyright work as a whole," 17 U.S.C. § 107(3), is "reasonable in relation to the purpose of copying," *Dr. Seuss*, 109 F.3d at 1402. The Sheriff's Department copied RUMBA Office in its entirety to ensure that all of the computers in the Twin Towers had identical copies of the software. And although "entire verbatim reproductions are justifiable where the purpose of the work differs from the original," *Mattel*, 353 F.3d at 804, the Sheriff's Department put its copies to the exact purpose for which the original software licenses were purchased. Consequently, the Sheriff Department's "verbatim" copying of the entire copyrighted work also weighs against a finding of fair use. *See Worldwide Church of God*, 227 F.3d at 1118 ("While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use.") (internal quotation marks omitted).

### d. Fourth Fair Use Factor: Effect of the Use Upon the Potential Market

[9] In addressing the final fair use factor, we focus on "the normal market for the copyrighted work" and whether the

allegedly infringing use threatens the potential market for, or value of, a copyrighted work. *See Harper & Row*, 471 U.S. at 568 (noting that the fourth fair use factor is concerned with "use that supplants any part of the normal market for a copyrighted work") (quoting S. Rep. No. 473, 94th Cong., 1st Sess. 65 (1975)). We have said:

> [t]his inquiry attempts to strike a balance between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied. The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use.

*Mattel*, 353 F.3d at 804-05.

The Sheriff's Department contends that its copying was solely an attempt to use efficiently its licensed copies of the RUMBA software products, and accordingly, there was no negative impact on Wall Data's market. It points to its own statements that it would not have purchased additional copies of the license had it known that its configuration went beyond its license. We are not persuaded. The Sheriff's Department bought a few licenses and found a way to install the program onto all of its computers without paying the fee required for each installation. The Sheriff's Department could have bargained for the flexibility it desired, but it did not. Whenever a user puts copyrighted software to uses beyond the uses it bargained for, it affects the legitimate market for the product. Thus, although hard drive imaging might be an efficient and effective way to install computer software, we conclude that "unrestricted and widespread conduct of the sort engaged in by the defendant" would nonetheless lead to over-use of the software. *Campbell*, 510 U.S. at 590 (quoting 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A](4), at 13-102.61 (1993)).

Equally important, ghost copies of the software lay dormant and were unuseable only *until* a Sheriff's Department network administrator decided to activate RUMBA Office on that computer. The Sheriff's Department thus created its own "sub-licensing" system where it granted users permission to use the software and, in essence, asked Wall Data to "trust" that it was not using RUMBA in excess of its authorization under the license. We recognize that computer licensing is generally an "honor system," in that there is little to stop a person with physical possession of software from installing it on multiple computers. But in this case, the Sheriff's Department's system made tracking infringement almost impossible, because Wall Data could not independently verify which of the computers had been used to access RUMBA and which ones had not — it had to trust the Sheriff's Department that its system was not allowing over-use. In fact, after Wall Data brought the over-use of RUMBA to the Sheriff's Department's attention, a Sheriff's Department employee admitted, in an email, that *he* was not sure how to tell which computers had accessed RUMBA.[7] This system therefore made copyright infringement easier (because no physical installation was necessary) and made detection of over-use more difficult.

**[10]** In recognition of the ease with which software can be over-used, courts have been cautious to extend protection to methods that would make copyright infringement of software any easier:

> Software fundamentally differs from more traditional forms of medium, such as print or phonographic materials, in that software can be both, more readily and easily copied on a mass scale in an extraordinarily short amount of time and relatively inexpensively. One of the primary advantages of

---

[7]The Sheriff's Department has argued that this document is inadmissible. As discussed more fully below, we believe the district court did not err in allowing this document to be introduced.

software, its ability to record, concentrate and convey information with unprecedented ease and speed, makes it extraordinarily vulnerable to illegal copying and piracy. [Thus,] it is important to acknowledge these special characteristics of the software industry and provide enhanced copyright protection for its inventors and developers.

*Adobe Sys., Inc. v. Stargate Software Inc.*, 216 F. Supp. 2d 1051, 1059 (N.D. Cal. 2002). We believe that "widespread use" of hard drive imaging in excess of one's licenses could seriously impact the market for Wall Data's product. *See Campbell*, 510 U.S. at 590 (citations omitted). Therefore, we conclude that the fourth factor also weighs against a finding of fair use.

* * *

**[11]** In considering the four fair use factors — the purpose and character of the work, the nature of the use, the amount and substantiality of the portion used, and the effect on the plaintiffs' market — none militate in favor of the Sheriff's Department's fair use defense. We therefore hold that the Sheriff's Department is not entitled to a fair use defense, and we affirm the district court's order granting summary judgment on the Sheriff's Department's fair use defense.

## B. The District Court's Evidentiary Rulings Were Not Erroneous

We review a district court's evidentiary rulings for an abuse of discretion. *See Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195 (9th Cir. 2001). Prejudice must be shown to warrant a reversal. *See id.* As explained below, the district court did not abuse its discretion when it ruled against the Sheriff's Department on the admissibility of certain evidentiary matters.

### 1. Exclusion of Irrelevant Evidence

The district court did not abuse its discretion when it ruled against the Sheriff's Department on the admissibility of the following evidence: (1) excerpts from Wall Data's 10k report to the Securities and Exchange Commission ("SEC"); (2) the Sheriff's Department's Master Vendor Agreements; and (3) evidence regarding Wall Data's communications with other customers and its instructions to its sales personnel describing RUMBA software licenses. We agree with the district court that the evidence offered by the Sheriff's Department was irrelevant, would have consumed an unreasonable amount of time, would have caused jury confusion, or would have unduly prejudiced Wall Data. *See* Fed. R. Evid. 401, 402, 403. In any event, we find that any error in excluding the evidence was harmless.

**[12]** First, the district court did not err when it excluded from evidence an excerpt from Wall Data's 10k report to the SEC. The relevant excerpt consisted of a general statement that Wall Data's shrink-wrap licenses "may be unenforceable." Such licenses were clearly enforceable in California and Washington, the relevant jurisdictions in these actions. *See, e.g.*, *Lozano v. AT&T Wireless*, 216 F. Supp. 2d 1071, 1073 (C.D. Cal. 2002); *M.A. Mortenson Co. v. Timberline Software Corp.*, 998 P.2d 305, 313 (Wash. 2000). The 10k report was irrelevant because it did not deal specifically with the action at hand. Therefore, the district court's decision to exclude such evidence was not an abuse of discretion.

**[13]** Next, the district court did not abuse its discretion when it excluded evidence of Master Vendor Agreements governing the Sheriff's Department's purchase of software. The Sheriff's Department ordered RUMBA software products through one of the Sheriff's Department's resellers, an approved Los Angeles County vendor, who in turn, ordered the products from a Wall Data distributor. The Master Vendor Agreements governed the relationship between the Sheriff's

Department and the reseller, not the relationship between the Sheriff's Department and Wall Data. Because Wall Data was not a party to the Master Vendor Agreements, the district court ruled that the Sheriff's Department could only introduce such documents for purposes of estoppel if the Sheriff's Department could prove that Wall Data had knowledge of them. The Sheriff's Department conceded that it had no evidence that Wall Data knew of the agreements. Because Wall Data had no knowledge of the agreements, we agree with the district court that the Master Vendor Agreements were not binding on Wall Data and were therefore irrelevant to the proceeding. We thus conclude that the district court did not abuse its discretion in excluding the Master Vendor Agreements.

**[14]** The district court properly excluded evidence related to Wall Data's communications with other customers and existence of another Wall Data software product, CYBER-PRISE. We agree with the district court that Wall Data's communication with other customers regarding licenses for the products they purchased was irrelevant to the case at hand. The court also acted properly when it excluded all evidence related to CYBERPRISE. Unlike RUMBA, which was designed to be installed on physical workstations, CYBER-PRISE was accessed through the internet. CYBERPRISE was also licensed under a concurrent user licensing system, which made the physical location of the user irrelevant.[8] Because there were clear difference between the two products, information about CYBERPRISE would distract the jury from the relevant issues in this case. Accordingly, the district court did not err in excluding evidence relating to CYBERPRISE.

**[15]** Finally, the district court decision to exclude Wall

---

[8]A concurrent user license allows multiple users to access the same software, but limits the number of simultaneous computer users to the number of licenses purchased. For example, where a licensee purchases five concurrent use licenses, five people would be able to access the software, but when the sixth person tried to access the software, access would be denied.

Data's instructions to sales personnel describing RUMBA software licenses was not reversible error. The licenses clearly state that reliance should not be placed on representations made by Wall Data employees. In addition, even though the district court granted a motion in limine excluding this evidence, the Sheriff's Department nonetheless introduced testimony regarding conversations between its employees and Wall Data employees. The Sheriff's Department did not point to any evidence that they were prevented from offering because of the district court's ruling. The Sheriff's Department has not shown any prejudice based on the district court's ruling on the motion in limine, and therefore any error was harmless.

The district court did not abuse its discretion when it found that the above evidence would confuse or mislead the jury. Accordingly, the district court's evidentiary rulings on these points are affirmed.

### 2. Admission of the Sheriff's Department's Internal Memorandum

Before trial, the district court ruled that internal Sheriff's Department communications concerning settlement negotiations between Wall Data and the Sheriff's Department would be excluded. The district court later allowed Wall Data to introduce an internal memorandum dated March 23, 2001, prepared by a Sheriff's Department employee related to the dispute. In the memorandum, a Sheriff's Department employee admitted that he "did not know how to tell which [computers] RUMBA is used on and on which ones it has never been used." The Sheriff's Department objected on the basis that the memorandum was prepared in aid of settlement discussions. The district court overruled the Sheriff's Department's objection and allowed Wall Data to introduce the document.

On appeal, the Sheriff's Department claims that admission of the document constitutes reversible error because the mem-

orandum was prepared in aid of settlement discussions. Not so. The district court properly determined that the parties' settlement discussions did not crystallize until March 29, 2001, almost a week after this memorandum was written. This memorandum merely recounted a meeting between Sheriff's Department employees and Wall Data to discuss possible over-use of the RUMBA licenses. Because the memorandum did not contain evidence "furnishing or offering or promising to furnish . . . valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount," Fed. R. Evid. 408, and because the memorandum was written before settlement discussions began, admission of the memorandum by the district court did not constitute reversible error.

### C.   The District Court's Jury Instructions Were Not Erroneous

We review *de novo* whether a jury instruction misstates the law. *See White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002). We review a district court's formulation of civil jury instructions for an abuse of discretion. *See Monroe v. City of Phoenix*, 248 F.3d 851, 857 (9th Cir. 2001). An error in instructing the jury in a civil case does not require reversal if that error is harmless. *See id.* at 860.

The district court concluded that many of the parties' proposed jury instructions were "slanted or argumentative one way or the other" and "were not appropriate or were confusing to the jury." For this reason, the district court fashioned jury instructions for the parties. As discussed below, the district court's jury instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading. *See Duran v. City of Maywood*, 221 F.3d 1127, 1130 (9th Cir. 2000).

### 1. Jury Instructions Related to the Essential Step Defense Under 17 U.S.C. § 117 Were Not Erroneous

The Sheriff's Department requested that the district court instruct the jury on the difference between a "licensee" and an "owner" for purposes of a § 117 "essential step" defense. We conclude that the district court did not abuse its discretion when it declined to do so.

**[16]** The essential step defense attempts to strike a balance between the interests of software users and software developers. *See* 17 U.S.C. § 117. This section permits *the owner* of a copy of a copyrighted computer program to make (or authorize the making of) another copy of the program, if the copy is created as an "essential step in the utilization of the computer program in connection with the [computer, and] is used in no other manner." *Id.* The "essential step" defense also ensures that a software user does not infringe when the user "copies" the software from the computer's permanent storage (the hard drive, for example) onto its active memory (the random access memory, for example). Section 117 also allows the owner to make a copy of the computer program if the copy is "for archival purposes only and . . . all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful." *Id.*

**[17]** Section 117, by its own terms, applies only to "the *owner of a copy* of the computer program." 17 U.S.C. § 117 (emphasis added). In the leading case on ownership under § 117, we considered an agreement in which MAI, the owner of a software copyright, transferred copies of the copyrighted software to Peak under an agreement that imposed severe restrictions on Peak's rights with respect to those copies. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993). We held that Peak was a licensee and not an owner of the copies of the software for purposes of § 117 and consequently did not enjoy the rights conferred on "owners"

under that statute. *See id.* at 518 n.5. Thus, under *MAI*, if a software developer retains ownership of every copy of software, and merely licenses the use of those copies, § 117 does not apply.

**[18]** Here, we conclude that the Sheriff's Department received licenses to the RUMBA software. Generally, if the copyright owner makes it clear that she or he is granting only a license to the copy of software and imposes significant restrictions on the purchaser's ability to redistribute or transfer that copy, the purchaser is considered a licensee, not an owner, of the software. In this case, as in *MAI,* the licensing agreement imposed severe restrictions on the Sheriff's Department's rights with respect to the software. Such restrictions would not be imposed on a party who owned the software. The Sheriff's Department's use of and rights to the RUMBA software products were restricted under the terms of the click-through and volume booklet licenses. These restrictions were sufficient to classify the transaction as a grant of license to Wall Data's software, and not a sale of Wall Data's software. For these reasons, under *MAI*, the Sheriff's Department is not the "owner" of copies of Wall Data's software for purposes of § 117.

Even if we were to accept that the Sheriff's Department was the "owner of copies" of RUMBA for § 117 purposes,[9]

---

[9]We recognize that our decision in *MAI* has been criticized. *See* Nimmer on Copyright § 8.08[B][1][c], at 8-136; *see also DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354, 1360 (Fed. Cir. 1999). Indeed, the first sale doctrine rarely applies in the software world because software is rarely "sold." *See Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086, 1091 (N.D. Cal. 2000) ("[V]irtually all end users do not buy — but rather receive a license for — software. The industry uses terms such as 'purchase,' 'sell,' 'buy,' . . . because they are convenient and familiar, but the industry is aware that all software . . . is distributed under license."). By licensing copies of their computer programs, instead of selling them, software developers maximize the value of their software, minimize their liability, control distribution channels, and limit multiple users on a net-

the Sheriff's Department's conduct was not an "essential step," and therefore any error in instruction was harmless. The Sheriff's Department argued that "it was inherently necessary to copy the entire RUMBA package onto hard drives, albeit within the constraints of a security system that made the challenged copies unusable." This argument is unpersuasive. Substantial evidence demonstrates that the Sheriff's Department's decision to copy the RUMBA software products was not an essential step, but a matter of convenience. It copied the software onto 75 computers without the aid of hard drive imaging, and switched to hard drive imaging because its deadline in opening Twin Towers loomed large, not because manual installation had become more difficult. Even under time pressure, there was no need for the Sheriff's Department to copy the RUMBA Office software onto the hard drives of *nearly* all of its Twin Towers computers. Instead, the Sheriff's Department could have used hard drive imaging to install RUMBA software onto the number of computers for which it had licenses. Its decision not to do so was an effort to save time and preserve flexibility, and was not a necessity. We conclude that the essential step defense was not intended to cover such situations. Consequently, any failure by the district court to instruct the jury on the distinction between an owner and a licensee was harmless.

### 2. The District Court's Refusal to Instruct the Jury on Rules of Contract Formation

The district court ruled that the click-through, shrink-wrap, and volume booklet licenses constituted the operative con-

work from using software simultaneously. *See* Christian H. Nadan, *Software Licensing in the 21st Century: Are Software "Licenses" Really Sales, and How Will the Software Industry Respond?*, 32 AIPLA Q.J. 555. We decline to revisit our precedent in this case, because the Sheriff's Department's "essential step" defense fails for a more fundamental reason — that hard drive imaging was not an essential step of installation — and thus any error is harmless.

tracts, and declined to instruct the jury on the rules of contract formation and construction, as suggested by the Sheriff's Department. Because contract formation and interpretation are questions of law for the court to determine, *see In re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002), the district court did not abuse its discretion when it declined to instruct the jury as to formation and construction of a contract. Moreover, because the sole issue to be resolved at trial was whether the Sheriff's Department violated the terms of Wall Data's licenses, instructions related to contract formation and interpretation were unnecessary.

### 3. Jury Instructions Regarding Damages

The district court gave the following jury instructions related to damages:

> Damage means the amount of money which will reasonably and fairly compensate Wall Data for any injury you find was caused by the Los Angeles sheriff's department. . . . Your award must be based on evidence and not speculation, guesswork, or conjecture. . . . Actual damages means the amount of money to adequately compensate the copyright owner for the reduction of the market value of the copyrighted work caused by the infringement. The reduction of the market value of the copyrighted work is the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by the Los Angeles Sheriff's department of the plaintiff's work. That amount also could be represented by the lost license fees Wall Data would have received for the unauthorized copies.

We conclude that such instructions properly state the law of damages in a copyright infringement suit. "Actual damages are usually determined by the loss in the fair market value of

the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) (quoting *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003)). "[I]t is not improper for a jury to consider either a hypothetical lost license fee or the value of the infringing use to the infringer to determine actual damages, provided the amount is not based on 'undue speculation.' " *Id.* at 709 (quoting *McRoberts Software*, 329 F.3d at 566). The district court properly instructed the jury in line with our circuit's caselaw, and accordingly this instruction was proper.

Moreover, the jury's finding was appropriate and was not speculative, and therefore any error was harmless. Specifically, the jury heard testimony from Wall Data's vice president that the average price Wall Data charged the vendor that sold software to the Sheriff's Department was $189. She admitted on cross-examination that government entities were charged $113 per copy. The jury returned a general verdict awarding Wall Data damages of $210,000. It is not clear how the jury calculated this award: At one extreme, if the jury found that the Sheriff's Department infringed on 2,344 copies (6,007 computers — 3,663 total RUMBA Office and RUMBA Mainframe licenses), the award was approximately $90 per copy. At the other extreme, if the jury found that the Sheriff's Department infringed on 3,962 copies (6,007 computers — 2035 RUMBA Office licenses), the award was $53 per copy. Either way, these amounts were within an acceptable range — $85 original price paid by the Sheriff's Department and $189 average price. Because "the jury's verdict[ ] find[s] substantial support in the record and lie[s] within the range sustainable by the proof," any error in instruction was harmless. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1365 (9th Cir. 1986).

## D.   Wall Data's Attorneys' Fees

**[19]** The Copyright Act provides for an award of reasonable attorneys' fees "to the prevailing party as part of the

costs." 17 U.S.C. § 505. A district court may consider (but is not limited to) five factors in making an attorneys' fees determination pursuant to § 505. These factors are (1) the degree of success obtained, (2) frivolousness, (3) motivation, (4) reasonableness of losing party's legal and factual arguments, and (5) the need to advance considerations of compensation and deterrence. *See Smith v. Jackson*, 84 F.3d 1213, 1221 (9th Cir. 1996) (citations omitted). We review a district court's decision regarding the award of attorneys' fees under the Copyright Act for an abuse of discretion. *See Mattel,* 353 F.3d at 814.

**[20]** In this case, the district court cited the above-listed factors in its order granting Wall Data's motion for attorneys' fees. It found that Wall Data was the prevailing party, even though Wall Data's ultimate recovery was less than that which it originally sought. Contrary to the Sheriff's Department's argument, this was not an abuse of discretion. *See* Nimmer on Copyright § 14.10[B], at 14-176 to -177 ("The plaintiff will ordinarily be regarded as the prevailing party if he succeeds at trial in establishing the defendant's liability, even if the damages awarded are nominal or nothing."). The court therefore concluded that attorneys' fees furthered the goal of copyright law. It found that the attorneys' rates were reasonable within the prevailing market, but reduced the total award based on the experience of the attorneys and the complexity of the issues. Reversal is not appropriate here because we lack a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. *See Smith*, 84 F.3d at 1221.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's orders entering final judgment following a jury trial against the Sheriff's Department and awarding Wall Data attorneys' fees and costs.